489 F.Supp.2d 230 (2007)
In re ZYPREXA PRODUCTS LIABILITY LITIGATION.
Monty Souther, Robert Cusella, Judith New, Beverly Pearson, Donna Worthington, Plaintiffs,
v.
Eli Lilly & Company, Defendant.
Nos. 04-MD-1596, 06-CV-1729.
United States District Court, E.D. New York.
June 11, 2007.
*231 *232 *233 *234 J. Christopher Ide, Michael J. Joseph Miller, Miller & Associates, Alexandria, NY, for Plaintiffs.
Lawrence J. Myers, Smith Moore, Atlanta, GA, Samuel J. Abate, Jr., Pepper Hamilton LLP, New York, NY, for Defendant.

MEMORANDUM, ORDER, & JUDGMENT
WEINSTEIN, Senior District Judge.

 TABLE OF CONTENTS
 I. Introduction .....................................................................236
 A. History of Litigation ........................................................236
 B. Some General Considerations ..................................................238
 1. Preemption ...............................................................240
 2. Benefits and Roles of Others Reducing Damages ............................241
 3. Protections Available to Plaintiffs Through Sources Such as Available
 Experts' Information and Treating Physicians ...........................244
 4. Appropriate Recoveries and Payments ......................................245
 C. Motions for Summary Judgment .................................................247
 II. Facts ............................................................................248
 A. Nature of Zyprexa ............................................................248
 B. FDA Labeling .................................................................248
 1. September 2003 Label Change ..............................................248
 2. Consensus Statement of American Diabetes Association and Other
 Learned Groups .........................................................249
 3. FDA March 2007 Letter ....................................................250
*235
 C. International Zyprexa Labeling ...............................................250
 1. Japan ....................................................................250
 2. European Union, Australia, and Canada.....................................250
 D. Lilly's Promotion of Zyprexa..................................................250
 1. Pre-September 2003 Label..................................................250
 2. Post-September 2003 Label.................................................251
 E. Plaintiffs ...................................................................253
 1. Robert Cusella ...........................................................253
 a) Patient History ......................................................253
 b) Prescribing Physician's State of Knowledge ...........................253
 c) Representations Made by Lilly Salespeople ............................255
 2. Judith New ...............................................................256
 a) Patient History ......................................................256
 b) Prescribing Physician's State of Knowledge ...........................256
 c) Representations Made by Lilly Salespeople ............................257
 3. Monty Souther ............................................................259
 a) Patient History ......................................................259
 b) Prescribing Physicians' State of Knowledge ...........................259
 c) Representations Made by Lilly Salespeople ............................261
 4. Donna Worthington ........................................................261
 a) Patient History ......................................................261
 b) Prescribing Physician's State of Knowledge ...........................261
 c) Representations Made by Lilly Salespeople ............................262
III. Summary Judgment .................................................................262
 A. Law ..........................................................................262
 1. Summary Judgment Standard ................................................262
 a) Generally ............................................................262
 b) Right to a jury ......................................................263
 2. Choice of Law ............................................................264
 a) Substance ............................................................264
 b) Statute of Limitations ...............................................264
 3. Florida Law ..............................................................265
 a) The Learned Intermediary Doctrine ....................................265
 b) Adequacy of Warning ..................................................266
 c) Statute of Limitations ...............................................266
 4. Pennsylvania Law .........................................................267
 a) The Learned Intermediary Doctrine ....................................267
 b) Adequacy of Warning ..................................................268
 c) Statute of Limitations ...............................................268
 5. North Carolina Law .......................................................269
 a) The Learned Intermediary Doctrine ....................................269
 b) Adequacy of Warning ..................................................269
 c) Statute of Limitations ...............................................269
 6. Application of Federal Law ...............................................270
 a) Preemption ...........................................................270
 i) FDA Preamble ...................................................270
 ii) FDA Regulation of Prescription Drug Warning Labels .............271
 iii) Deference Due FDA's Interpretation .............................272
 iv) FDCA Preemption of State Law Causes of Action ..................272
 b) Preemption of State Failure to Warn Claims ...........................273
 i) The Preamble Does Not Control the Question of Preemption .......273
 ii) State Law Failure to Warn Claims are Not Preempted ..............275
 7. Damages Issues ...........................................................278
 B. Application of Law to Facts ..................................................278
 1. Robert Cusella ...........................................................278
 a) Choice of Law ........................................................278
 b) Statute of Limitations ...............................................278
 c) Adequacy of Warning Post-September 2003 Label Change .................278
*236
 d) Deposition of Treating Physician .....................................279
 e) Summary Judgment Decision ............................................279
 2. Judith New ...............................................................279
 a) Choice of Law ........................................................279
 b) Statute of Limitations ...............................................279
 c) Adequacy of Warning Post-September 2003 Label Change .................279
 d) Deposition of Treating Physician .....................................279
 e) Summary Judgment Decision ............................................279
 3. Monty Souther ............................................................279
 a) Choice of Law ........................................................279
 b) Statute of Limitations ...............................................279
 c) Adequacy of Warning Post-September 2003 Label Change .................279
 d) Deposition of Treating Physician .....................................279
 e) Summary Judgment Decision ............................................279
 4. Donna Worthington ........................................................280
 a) Choice of Law ........................................................280
 b) Statute of Limitations ...............................................280
 c) Adequacy of Warning Post-September 2003 Label Change .................280
 d) Deposition of Treating Physician .....................................280
 e) Summary Judgment Decision ............................................280
 5. Adequacy of September 2003 Warning Label .................................280
 IV. Admissibility of Expert Opinions at Trial ........................................281
 A. Motions Regarding Admissibility of Expert Reports ............................281
 B. Rules 702 and 703 of the Federal Rules of Evidence ...........................281
 C. Qualifications of Expert Witnesses ...........................................282
 D. Helpfulness and Relevance ....................................................282
 E. Reliability ..................................................................283
 F. Individual Experts' Reports ..................................................285
 1. Challenges to Plaintiffs' Experts ........................................285
 a) Dr. Carol Levy, M.D ..................................................285
 b) Dr. Stefan P. Kruszewski, M.D ........................................286
 c) Dr. Arvin P. Shroff, Ph.D ............................................288
 2. Challenges to Defendant's Expert Dr. Robert R. Henry, M.D ................289
 V. Conclusion .......................................................................291
 A. Cusella ......................................................................291
 B. New ..........................................................................291
 C. Souther ......................................................................291
 D. Worthington ..................................................................291

I. Introduction
A. History of Litigation
Some 30,000 cases have been brought against Eli Lilly & Company ("Lilly") by plaintiffs suffering from serious psychiatric problems who were treated with the Lilly antipsychotic drug Zyprexa. They allege that Zyprexa caused deleterious side effects of excessive weight gain, hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of these side effects; and that, had they or their attending physicians been aware of the risk, they would not have taken Zyprexa.
Litigation against Lilly for injuries allegedly caused by Zyprexa was initiated in this court in March 2004. See Benjamin v. Eli Lily & Co., Docket No. 04-CV-00893. Thousands of cases were then transferred here from federal district courts throughout the United States pursuant to an order of the Judicial Panel on Multidistrict Litigation. See Letter from Multidistrict Litigation Panel to Clerk of the Eastern District of New York, No. 04-MD-1596 *237 (Apr. 14, 2004). In addition, similar cases are pending in state courts. See In re Zyprexa Prods. Liab. Litig., 239 F.R.D. 316 (E.D.N.Y. Jan.18, 2007) ("Memorandum on Cooperation Between Federal and State Judges").
The litigation has been administered as a quasi-class action. See In re Zyprexa Prods. Liab. Litig., 467 F.Supp.2d 256, 262 (E.D.N.Y.2006) ("The court, magistrate judge and special masters will continue to administer this litigation as a quasi-class action."); In re Zyprexa Prods. Liab. Litig., 451 F.Supp.2d 458, 477 (E.D.N.Y.2006) ("Recognizing its obligation to exercise careful oversight of this national `quasi-class action,' the court has already utilized its equitable power to limit attorneys' fees and costs . . .") (citation omitted); In re Zyprexa Prods. Liab. Litig., 433 F.Supp.2d 268, 271 (E.D.N.Y. 2006) (finding that case "may be characterized properly as a quasi-class action subject to the general equitable power of the court"); In re Zyprexa Prods. Liab. Litig., 424 F.Supp.2d 488, 491 (E.D.N.Y. 2006) (same); In re Zyprexa Prods. Liab. Litig., 233 F.R.D. 122, 122 (E.D.N.Y.2006) (same).
Cooperation between federal and state courts has been encouraged at all stages of the Zyprexa litigation. See, e.g., In re Zyprexa Prods. Liab. Litig., 467 F.Supp.2d 256, 262 (E.D.N.Y.2006) ("Cooperation with state courts will continue to be stressed."); In re Zyprexa Prods. Liab. Litig., No. MDL 1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 16, 2006) ("Coordination and cooperation between state and federal courts has been encouraged."); In re Zyprexa Prods. Liab. Litig., No. 04-MD-1596, 2006 WL 197151 (E.D.N.Y. Jan. 30, 2006) (letter to state judges with Zyprexa cases from federal MDL judge suggesting coordination and cooperation); In re Zyprexa Prods. Liab. Litig., No. MDL 1596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004) (directing defendant Lilly and PSCI to "confer regarding procedures for coordination of state court discovery with discovery in this MDL").
An attorneys' fee structure for many cases has been ordered, capping fees at 20% of recovery in smaller, lump-sum claims, and at 35% of recovery in other claims. See In re Zyprexa Prods. Liab. Litig., 424 F.Supp.2d 488 (E.D.N.Y.2006). Costs related to the individual cases and charged to the individual settling plaintiffs were limited. See In re Zyprexa Prods. Liab. Litig., No. MDL 1596, 2006 WL 2443248 (E.D.N.Y. Aug. 24, 2006). The magistrate judge allocated funds from a first common benefit fund after reviewing the first Plaintiffs' Steering Committee's ("PSC") applications. See In re Zyprexa Prods. Liab. Litig., No. 04-MD-1596, 2007 WL 805793 (E.D.N.Y. March 15, 2007). A second common benefit fund is presently being established to compensate members of a second PSC for their work. See In re Zyprexa Prods. Liab. Litig., 467 F.Supp.2d 256, 262 (E.D.N.Y.2006).
A national system for resolving Medicare and Medicaid liens has been approved. See In re Zyprexa Prods. Liab. Litig., 451 F.Supp.2d 458 (E.D.N.Y.2006). All states and the federal government have agreed to modify their lien demands to provide a national equitable system. See In re Zyprexa Prods. Liab. Litig., No. 04-MD-1596, 2006 WL 3501263 (E.D.N.Y. Dec. 4, 2006) ("In compliance with this court's instructions . . . all fifty states as well as the federal government have resolved their Medicare and Medicaid liens.") (citation omitted).
After discovery and negotiations, overseen in part by a court-appointed special discovery master and four special settlement masters, in November 2005 the defendant, without conceding liability, entered *238 into a settlement covering some 8,000 individual plaintiffs. See In re Zyprexa Prods. Liab. Litig., No. 04-MD-1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005). The settlement resolved virtually all cases then pending in the MDL, along with some state cases and some claims not yet filed. See id.
Following an influx of thousands of new cases, in January of 2007 the parties announced another round of settlements. Approximately 1,000 claims remain unresolved in the MDL cases. Four of those cases are slated to be tried beginning July 9, 2007; a number of the cases originally scheduled for trial on that date have been settled or withdrawn. Lilly has moved for summary judgment in these four cases, which are the subject of this memorandum.
A separate motion for summary judgment has been filed by Lilly against plaintiff Rickie Dickerson, who alleges that he developed acute pancreatitis as a result of his ingestion of Zyprexa. That motion will be dealt with in a separate memorandum and order.
B. Some General Considerations
Discussed in this section I.B. are developing general issues of liability and damages that may substantially reduce any recovery for plaintiffs should they obtain judgments in their favor. All the states whose substantive law is operative incorporate these general considerations in their laws.
Suits alleging injury resulting from the ingestion of pharmaceuticals designed for huge populations present more complicated liability and damages issues than traditional one-on-one tort suits such as those resulting from people stepping into potholes. The medical and scientific communities  and necessarily tort law  accept the reality that there can usually be no benefit without some cost in possible side effects in use of prescription drugs. Unlike the classic tort pothole situation, elimination of all risk is almost impossible in medicine. Health improvements, especially in the area of pharmaceuticals, have benefits and risks. Treatment, especially of the kind of serious debilitating mental diseases suffered by present plaintiffs, often necessitates a choice between imperfect options.
Developers of medicines are under social and economic pressure to put their products on the market quickly and spread their uses as widely as benefits allow. They may not rely on fraud. But they and the public are entitled to some guidance and limitations from other controlling entities.
Modern American jurisprudence suggests that a jury will have to consider a number of legal-equitable causal vectors, apart from those involving the named defendant and plaintiff, in determining whether liability of defendant has been proven, and, if so, what damages should be assessed against a pharmaceutical designer-manufacturer of a drug intended to alleviate serious psychiatric and physical problems.
As one commentator has put the matter:
It is not surprising, then, that courts now employ tort law to address the long-term social ramifications that a finding of liability will engender. For instance, most judges recognize that product liability judgments do not merely censure a single, random act of carelessness, but amount to a condemnation of an entire product line or way of doing business. In cases like this, therefore, courts applying tort principles routinely consider the interests of individuals other than those involved in the dispute. On the one hand, they might use the law as a *239 shield to protect not only the private litigant who has already been harmed, but all others who are subject to the same hazard. On the other hand, they may wield the law as a sword to discourage both the wrongdoer and other enterprises from creating and disseminating similar risks in the future. Perhaps more importantly, they often employ it to diffuse the private impact of injurious transactions by distributing their costs to other members of society.
Alan Calnon, Justice and Tort Law, 4 (1997). "[T]he fault system as it operates today, with comparative responsibility, is a very different system than the generally all-or-nothing regime that [Guido Calabresi] criticized in The Costs of Accidents [1970]." Donald G. Gifford, Forward, Calabresi's The Costs of Accidents: A Generation of Impact on Law and Scholarship, 64 Md. L.Rev. 1, 11 (2005); see also, e.g., Keith N. Hylton, Calabresi and the Intellectual History of Law and Economics, 64 Md. L.Rev. 85, 110 (2005) ("an evolutionary path of comparative causation in tort law"); id. at 112 (history of comparative causation); id. at 129 ("comparative causation is a more `precise' term than comparative fault"); id. at 135 (comparative causation rules approximate a "social optimum").
What has been said about latent diseases by one distinguished commentator applies as well to a case such as the instant one dealing with causation and pharmaceuticals:
[T]he activities of parties other than product manufacturers often are necessary contributing causes to the victims' latent diseases. The manufacture of cigarettes is a cause of the smoker's lung cancer, but so is the smoker's unwillingness to quit smoking after she becomes aware that smoking is dangerous. The manufacture of lead-based paint is an actual cause of a child's developing lead poisoning eighty years later, but so is the landlord's failure to prevent painted surfaces from deteriorating. In traditional tort terms, such issues were analyzed under the rubrics of contributory and comparative negligence, assumption of risk, and superseding cause.
Donald G. Gifford, The Peculiar Challenges Posed by Latent Diseases Resulting from Mass Products, 64 Md. L.Rev. 613, 617-18, (2005); see also id. at 667-68, 672, 674, 689 (situations where best "cost avoider" may be liable as in tobacco, lead, and guns); Guido Calabresi & Jeffrey 0. Cooper, New Directions in Tort Law, 30 Valparaiso U. L Rev. 859, 883 (1996) ("Given the advent of splitting rules, it would not take much of a doctrinal leap for splitting to spread into some . . . new areas.").
In making its determination of fault and damages the trier will need to consider in the larger legal and factual context the contribution to damage resulting from failures in a variety of systems designed to protect users of pharmaceuticals. They include: lack of adequate federal Food and Drug Administration ("FDA") supervision of the pharmaceutical industry; lack of sufficient testing by the manufacturer and failure to reveal risks in a timely manner, as well as circulating misleading information, see Restatement of the Law, Second, § 310, Conscious Misrepresentation Involving Risk of Physical Harm; id. § 311, Negligent Misrepresentation Involving Risk of Physical Harm; lack of sufficient information on risks and benefits of the drug and competing drugs available to the medical field because the usual medical publications and scientific sources other than the manufacturer or the FDA have not published necessary studies; failures of treating doctors to adequately inform themselves, to discuss risk and benefits with patients, and to exercise sound medical *240 judgment in treating patients; failures of insurance companies, administrators of drug plans and government agencies to monitor drugs they are paying for, see, e.g., Dan B. Dobbs, The Law of Torts, § 256 (2001) (liability of managed care associations for failure to protect clients); but cf. Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (claims under state law protecting patients' right to sue their HMOs for negligent utilization review superceded by ERISA) (criticized in Note, The Supreme Court 2003 Term: Leading Cases, 118 Harv. L.Rev. 456, 462-66 (2004)); and failures of the plaintiffs to pay attention to warnings they should have been aware of, to take up with treating physicians problems that became obvious  here such as weight gain  and to heed physicians' advice with respect to diet, exercise, and the like. These confounding factors may require the jury to limit any award of damages against a defendant manufacturer. The failure of each of the protective screens society relies upon to protect users of pharmaceuticals makes each screener's failure a "cause" of damages  that is to say if the manufacturer, the FDA, the scientific community, the insurer, the doctor, and the patient had each done their work well damages would have been less or nonexistent.

1. Preemption

A reasonable national public policy  in the absence of fraud  would give a pharmaceutical manufacturer protection against tort liability for failure to warn when the FDA had approved the accused warnings. See generally Part III.6.a, infra. Were that the law, Lilly would be liable at most for injuries caused by its failure to warn up to the time of either the first FDA-approved warning label ordered in October 1996, or the time of the new warning label ordered on September 11, 2003, or the distribution of "Dear Doctor" letters in March 2004 giving widespread notice of the September 2003 warnings. Preemption is best instituted by Congress, since it should provide national uniformity of liability and responsibility of the manufacturer, the doctor, other screeners, and the patient, and define the scope of state and federal substantive law protecting consumers of pharmaceuticals.
Here the law on preemption is ambiguous. Under such circumstances, a federal court should take the law's default position, honoring the traditional state control of tort law. See generally John C.P. Goldberg & Benjamin C. Zipursky, Accidents of the Great Society, 64 Md. L.Rev. 364 (2005).
Were the courts in a position to rely on the adequacy and candor of representations to the FDA and of robustness of inquiry and decisions of the FDA, a desirable result would be to apply preemption, excluding the state tort law relied upon by present plaintiffs. It is apparent, however, that the FDA's own research is limited and that it relies heavily on self-motivated representations and studies by the pharmaceutical industry. The FDA's attempts to keep abreast of and inform the public about dangerous side effects discovered only after a drug has been approved have been decried by many in the medical community as inadequate. See, e.g., Editorial, Rosiglitazone and Cardiovascular Risk, 356 New Eng. J. Med ____ (2007) ("The FDA frequently requires phase 4 trials to address some of the unanswered efficacy or safety questions at the time of approval. But [manufacturers] propose the designs, which sometimes compare their products with inferior treatments or doses. During the period from 1998 through 2003, only about a quarter of the required phase 4 trials were completed . . . This desultory approach to postmarketing studies necessarily *241 leads to an incomplete evaluation in the postapproval setting."); David B. Ross, The FDA and the Case of Ketek, 356 New Eng. J. Med. 1601 (2007) ("The postmarketing data submitted by Sanofi-Aventis were reviewed by the FDA without any verification of their accuracy or completeness. . . . ").
The divergence among the risk-benefit conclusions about Zyprexa and other drugs between, on the one hand, the FDA and the pharmaceutical industry, and, on the other, independent associations of scientists such as the American Diabetes Association, as well as alleged misleading by salespersons of Lilly arguably provides a murky mix of inadequate information and misinformation to doctors. While the much stronger Zyprexa labeling requirements in Japan and the European Union are not decisive, they do suggest the controversial nature of FDA supervision of drug warning labels. See Part II.C, infra; see, e.g., Gardiner Harris, Potentially Incompatible Goals at F.D.A.: Critics Say a Push to Approve Drugs is Compromising Safety, N.Y. Times, June 11, 2007, at A14; Gardiner Harris, F.D.A. Remains Unsettled in Wake of New Questions, N.Y. Times, May 31, 2007, at A14 (discussing pervasive criticism of FDA's handling of pharmaceutical safety concerns).
The work of the medical staffs, particularly psychiatrists, who prescribed Zyprexa for the current plaintiffs was in general extraordinarily good. The label warnings were meant for doctors. But even fine doctors have to rely on, and could have been misled by, the incomplete and possibly misleading information available to them as a result of lack of adequate warnings on the label and Lilly's overselling. Cf. Richard Horton, Book Review, What's Wrong With Doctors, The New York Review, 16 (May 31, 2007) (Review of "How Doctors Think" by Jerome Groopman) ("there can never be a purely rational or exact mathematical solution to a patient's predicament").
Given the high quality of treatment by plaintiffs' physicians and aides, their general knowledge, and their candid discussions with patients regarding risks and dangers, the summary judgment decision in all these cases is a close one. The experts for both sides are excellent and come to different conclusions on the key issues of adequacy of warning and causation.
State tort laws that are applicable provide substantial reliance on the protective nature of the treating physicians through the "learned intermediary" rule. See, e.g., Part III.A.3.a, infra. Given the alleged inadequacy of the warnings provided by Lilly to doctors, for most of the cases the learned intermediate defense is not sufficient to entirely block a judgment of liability.

2. Benefits and Roles of Others Reducing Damages

In the case of at least some of its users who were leading dismal, hazardous and burdensome lives as a result of their mental problems, Zyprexa provided a greatly improved quality of life. The trier may choose to weight the cost to the plaintiff in increase weight and diabetes against the gain in quality of life with Zyprexa; this consideration would be expected to reduce any damage awards.
Supporting reduction of damages when an injured plaintiff gained substantial benefit from the allegedly harmful activity of the defendant is a strong legal substratum upholding proportionality in damages and punishment based upon Benthamite pragmatic balancing of benefits and harms to society as well as to the parties. The law is cognizant of the real world complexity of causation with many "causes" for each *242 event. A defect in an alarm clock may "cause" a passenger to take a later train with defective brakes, and a tired engineer, that falls off a faulty trestle. Compare, e.g., Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99 (1928) ("proximate cause" limiting "but for" cause). Some division of liability and sharing of damages can be expected in multiple causation cases.
Developing tort law is based on consideration of economic theory, such as who can best bear the cost of harms, see e.g., Guido Calabresi, The Costs of Accidents: A Legal and Economic Analysis (1970); English development of the writ system and American legal history, see e.g., 1 Fowler Harper and Fleming James, Jr., The Law of Torts xxvii-xliv (1956); Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 139ff. (1946); Oliver Wendell Holmes, Jr., The Common Law (1881); and classical theory, see, e.g., John C.P. Goldberg & Benjamin C. Zipursky, Accidents of the Great Society, 64 Md. L.Rev. 364 (2005). But it also incorporates considerations of fairness as among the injured and others as well as an understanding of the myriad causes of harm to individuals in a complex modern society that has had to development of rules of proportionality. See Customs & Excise v. Barclays Bank, 4 All E.R. 256, ¶ 82 (House of Lords 2006) (Lord Mance) ("The conceptual basis on which courts decide whether a duty of care exists in particular circumstances has been repeatedly examined. Three broad approaches have been suggested, involving consideration (a) whether there has been an assumption of responsibility, (b) whether a three-fold test of foreseeability, proximity and `fairness, justice and reasonableness' has been satisfied or (c) whether the alleged duty would be `incremental' to previous cases. . . . All three approaches operate at a high level of abstraction. What matters is how and by reference to what lower-level factors they are interpreted in practice.") (citation omitted).
As the Supreme Court has noted in a punitive damages opinion:
The Due Process Clause of its own force prohibits the States' from imposing "grossly excessive" punishments on tortfeasors. . . . [W]e expressly noted that the courts of appeals must review the proportionality determination `de novo.'
Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434-35, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). But cf. Norfolk & Western Ry. Co. v. Ayers, 538 U.S. 135, 159-66, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003) (refusing to require apportionment of damages among firms contributing to asbestos disease of railroad employee in order to facilitate employee's recovery, but noting that indemnification was available).
There is a need for a jury instruction that will restrict the jury's discretion in these polycentric multiple "blame-causation" pharmaceutical cases by providing a standard of "justice." Excessive flexibility in applying views of individual jurors of "the" just result can reduce necessary predictability and uniformity required by the rule of law. As Professor Warren A. Seavey put it in his Mr. Justice Cardozo and the Law of Torts, 48 Yale L.J. 390, 401 (1938) (footnote omitted):
[T]he judge cannot . . . leave the whole matter to the jury without further statement than that a negligent defendant is liable if he was the legal cause of the harm. The result sought by Cardozo, Andrews [who wrote the dissenting opinion in Palsgraf], and all the others is a formula which with a fair degree of definiteness will mark the boundary between liability and nonliability and be consistent with our sense of justice as *243 this has been developed in imposing liability in negligence cases.
Articulation of the appropriate controlling charge to the jury can await the trial of the instant cases. That charge will take account of some aspect of the need for proportionality in liability, damages or both.
Society's current sense of justice has required modification of ancient all-or-nothing liability-damages principles. In tort law, contributory negligence which once blocked all damages has been replaced by comparative fault and apportionment of liability. See, e.g., ALI Restatement of the Law Third, Economic Torts and Related Wrongs Prel. Draft No. 3 (April 12, 2007), § 16, Contributory Negligence and Proportionate Responsibility (not yet adopted by ALI); id. § 8, Factors for Assigning Shares of Responsibility; id. § 26, Apportionment of Liability When Damages Can be Divided by Causation; id. § 18, Liability of Multiple Tortfeasors for Individual Harm; Restatement of the Law, Torts, Apportionment of Liability, § 7, comment a (comparative responsibility "replaces the rule of contributory negligence as an absolute bar to a plaintiff's recovery . . ."). In capital crimes, the cruel 18th century all-encompassing felony-death rule has been replaced by one considering mitigating factors. See 18 U.S.C. § 3592 (mitigating and aggravating factors to be considered in determining whether a death sentence is justified). The rule that there can be no recovery for emotional harm is now often negated when the harm is serious and there are other confounding circumstances. See Restatement of the Law Third Torts: Liability for Physical and Emotional Harm, Tent. Draft No. 5, April 4, 2007, Reporters Note p. 4ff (not yet adopted by ALI). "An actor may be absolved from liability for harm forseeably resulting from the actor's negligence when the liability would be unfairly disproportionate to the actor's fault and compensation." Restatement of the Law Third of Economic Torts and Related Wrongs, Prel. Draft No. 3 (April 12, 2007) p. 17 (not yet adopted by ALI); id. at p. 78, § 18 Damages ("Responsibility is apportioned for that part of the damages the claimant could have [reasonably] avoided without undue risk or burden"); id. at p. 112 ("estoppel will lie only if necessary to avoid injustice and only when it does not stultify the policies of the law"). Sentencing increasingly considers restorative needs of the criminal and victim rather than rigid "just desserts." See Model Penal Code Sentencing, Tent. Draft No. 1 (April 9, 2007) (not yet adopted by ALI), p. 27 ("The goal of proportionality in punishment is ubiquitous. . . ."). In the area of unjust enrichment, the availability of a remedy is qualified to avoid unfair hardship. See Restatement of the Law Third Restitution and Unjust Enrichment Tent. Draft No. 5 (March 12, 2007) (not yet adopted by ALI), p. 117, id. p. 119 ("the remedial spectrum"). The good samaritan's responsibility for negligence in rescue may be forgiven or minimized because of good intentions. See, e.g., Dan B. Dobbs, The Law of Torts 663 (2001); N.Y. Education Law § 6527(2) (good samaritan immunity for licensed physicians). The "measure of a recipient's unjust enrichment may depend on the recipient's degree of fault." ALI Draft Restitution and Unjust Enrichment § 49(3), Measures of Enrichment; Classes of Recipient. In protection of civilians under the laws of war, proportionality is central. See In re Agent Orange Prod. Liab. Litig., 373 F.Supp.2d 7, 79 (E.D.N.Y.2005) (Part XI.D.3, Proportionality). In admiralty, shared damages based upon degrees of fault is enforced. See, e.g., 46 U.S.C. § 762(a) ("fair and just compensation," "apportioned" in proportion to the loss they may have suffered).
*244 The current trend towards reasonableness is illustrated by the following hypothetical situations: (1) A motorist hits a pedestrian causing damage to three ribs, lacerations, and out-of-pocket losses for which the jury awards $100,000,000. (2) A pedestrian is drowning when a good samaritan saves his life, but does it negligently so that the victim suffers the same harm due to the negligence as in (1). Would the same jury award the pedestrian $100,000,000 against his rescuer? It seems doubtful. Yet, that would be the result of the traditional all or nothing rule. See, e.g., Beasley v. MacDonald Eng'g Co., 287 Ala. 189, 249 So.2d 844, 847 (1971); Mark Turner, Dial 911: Emergency Medical Care Providers, Gross Negligence, and the Loophole in the Connecticut Good Samaritan Statute, 19 Q L Rev. 419, 445-46 (2000); Marc A. Franklin & Mathew Ploeger, Of Rescue and Report: Should Tort Law Impose a Duty to Help Endangered Persons or Abused Children, 40 S.C.L.Rev. 991, 996-99 (2000).
The present cases, of course, do not involve a good samaritan. But the example illustrates why current law reflects a sense of multiple causes, shared responsibility, intention, and proportionality in finding liability and in assessing damages. The governing tort law in each of the instant cases includes the learned intermediary defense  an aspect of proportionality that shifts at least some of the burden of protecting patients from pharmaceutical manufacturers to treating physicians See, e.g., Part III.A.3.a, infra. In a case such as the present one the learned intermediary rule cannot be viewed as an all-or-nothing regulation that absolves the manufacturer, shifting the onus entirely to the treating physician, but its force in ameliorating liability for damages of the manufacturers cannot be ignored.
3. Protections Available to Plaintiffs Through Sources Such as Available Experts' Information and Treating Physicians
The conclusions of specialized medical and scientific panels, selected on as unbiased a basis as practicable, is particularly important in evaluating relevant studies and gaps in data and such documents as peer-reviewed articles. These panels often are not capable of, or interested in, declaring  in a form equivalent to civil litigation's "more probable than not" standard  a statistically-based probability of the adverse side affects or the benefits of pharmaceuticals and toxic substances with respect to general causation, specific causation, or other relevant legal issues. Such panels can, however, by meta-analysis of extant studies and other information, provide the best available estimates on such factors as risks and benefits to a doctor, a patient, or a jury. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the Rules of Evidence do not require more than a scientist's rational conclusions drawn from reasonably reliable available data. See Part IV, infra. Predicting adverse side effects or benefits in the early stages of the use of a new pharmaceutical is as much art as science. Precise quantification is not a prerequisite to admissible opinion testimony. To utilize Daubert to exclude useful scientific evidence is to distort both science and the constitutional right to a jury trial. Medical science  less perhaps than "soft" sciences like sociology, and more perhaps than "hard" sciences like chemistry or physics  requires the judgment of the individual researcher and physician.
Epidemiologists and other scientists will be called to testify at the trial. The trained judgments of such scientists may *245 in good faith differ when analyzing the same available data.
Despite the many drug safety and efficacy screens in this country  the manufacturers' own revealed tests, medical scientists and their peer-reviewed studies, the FDA, the competitive marketplace, self-interest of the patient, the general body of medical knowledge available to the public and to physicians, checks by managed care and insurance institutions, and the deterrent threat of tort law  ultimately it is the treating physician that we rely upon as the guardian of individual health.
Where summary judgment motions are pending in the instant individual cases, a reasonable juror could find that by the time a reasonably informed treating physician should have been aware of the label warning required by FDA, each plaintiffs treating physician already knew that Zyprexa was associated with weight gain and diabetes, and believed that the benefits of the particular seriously ill patient being treated warranted assuming the risks and benefits of Zyprexa as against the risks and benefits of other drugs and modes of treatment.
In each of the instant claims, the treating physician made a judgment, after balancing the potential benefits and risks of other drugs and methods of treatment, that Zyprexa should be prescribed for the patient at the time it was administered. See Parts II.E.1.b, 2.b, 3.b, 4.b, infra; Appendices A, B, C, and D, infra. Despite possible overselling by some Lilly salespeople, the evidence is strong that, for the most part, the individual physicians and physicians aides here were in a position to knowingly exercise their obligation to their patients and that they were sufficiently aware of Zyprexa's relative dangers. A jury could find that the latest date beyond which it was unreasonable for the doctor not to have been aware was when Dear Doctor letters were sent on March 1, 2004, at the FDA's direction, many months after the new warnings were published. Because, however, of the claim, that has some support, that Lilly salespeople might have been misleading at least some treating medical staff, the issue of a cutoff date is best left for the jury except in one case. See Part III.B.1.e, infra.

4. Appropriate Recoveries and Payments

In a mass pharmaceutical injury case such as this one  as well as in toxic tort cases exemplified by asbestos, breast implants and Agent Orange  it is important that all those who are entitled to damages, as a result of the facts and law, have an opportunity to file timely claims and have them prosecuted by competent lawyers. A powerful plaintiffs' bar is available to prospective claimants, utilizing advertising, references of cases from originating attorneys to specialists, contingency fee arrangements and substantial capital to investigate claims, retain suitable experts, and conduct complex discovery, motion practice, settlement negotiations and, when needed, trials.
Despite this effective civil prosecution network, there are usually a substantial number of potential harmed plaintiffs who never press their claims. There also are usually a substantial number of claims that are marginal or unfounded, but hyped and prosecuted using a variety of questionable techniques.
Even for a defendant, such as Lilly, which has decided to settle and pay reasonable Zyprexa user claims, the problem of totally disposing of a massive potential litigation, so that its main business can be conducted with emphasis on research and production of useful medicines rather than on costly litigation distractions, remains difficult. There is to be expected a massive *246 infusion of new claims  many possibly ill-founded  when news of a willingness to pay hits the legal Rialto. The class action's capacity to protect against unfounded current and future claims has now been restricted, at least in the estimate of some courts and litigators, by decisions of the Supreme Court and Courts of Appeals. See generally In re Zyprexa Prods. Liab. Litig., 238 F.R.D. 539 (E.D.N.Y.2006).
Faced with small elements of the legal community which may appear rapacious, industry looks to the courts to separate the worthy from the unworthy claims. Yet, the normal tools for excluding non-meritorious claims  summary judgment, trials and appeals  remain expansive and consuming of executive energy and capital availability while the litigation drags on.
In the present litigation, the first eight thousand or so claims were settled using a discovery master, magistrate judge, and efficient national assembly of documents collected by a Plaintiffs' Steering Committee; fees were controlled; liens were compromised on a national basis; and four special masters, using a matrix, passed on the validity of the claims, assigning appropriate values to each of them.
In the second phase involving many thousand of subsequent individual claims, settlements were made individually, without any check of fairness by the court or its designees. The present four summary judgment motions are examples of those cases.
Whatever the advantages to available court procedures limiting the "piling on" phenomena in mass tort cases, the process involves substantial transactional costs. The substitute opted for by most attorneys is settlement  the acceptance of proportionality and reasonableness in demands for compensation.
The danger of "piling on" in the instant litigation is exacerbated by the substantial Medicare and Medicaid liens of the states and federal government, which lead to pressure for higher settlement so that the plaintiffs  and their attorneys  can gain some compensation for their alleged suffering. In addition, some states are now claiming reimbursement directly from Lilly for their purchases of Zyprexa. And private unions, insurers and the like are seeking third-party reimbursement for their purchases of Zyprexa on behalf of those they were insuring. Shareholder suits based on alleged misleading of investors about Zyprexa are also pending. While somewhat different from the catastrophic costly litigation that led to so many bankruptcies in the asbestos and breast implant industries, all of the actual and potential Zyprexa-based claims increase the stakes for both plaintiffs and defendants, and place added pressure on the legal system to provide rational and affordable compensation schemes.
In almost every conglomerate litigation  including class actions and quasi-class actions such as the instant one  the claimants with the best claims receive somewhat less than they would have obtained in individual suits, while the less worthy claimants receive somewhat more. The advantages to all plaintiffs and defendants in predictability and reduced transaction costs usually more than offsets the disadvantages of these disparities. In the present settlement phase of the user-Zyprexa cases, in addition to the good sense and bona fides of plaintiffs' attorneys, some counsel have retained neutral advisors to ensure a proper division of damages among their clients. For ethical as well as tort law conceptualizations, substantial efforts to provide a reasonable and proportionate division of payments between defendant and plaintiffs, and among plaintiffs, is necessary and justified.
*247 When all is said and done, however, the gold standard for deciding the value of any case for settlement purposes is what juries have awarded in similar cases. Since no jury trials have taken place in the Zyprexa litigation, despite the maturity of the dispute, currently scheduled jury trials will be observed with considerable interest in connection with future settlements.
C. Motions for Summary Judgment
Lilly has moved for summary judgment in the four cases discussed in this memorandum, primarily on the theory that the prescribing physician was aware, or should have been aware, of the risks of weight gain and diabetes associated with Zyprexa. In September of 2003, a new warning about the risks of which plaintiffs complain was directed by the FDA to be placed on Zyprexa package inserts. Lilly argues that, as a matter of law, knowledge of these possible side effects was attributable to plaintiffs' prescribing physicians on or after that date. The applicable state laws provide that FDA approval does not automatically make a prescription drug warning adequate as a matter of law, and most federal courts have refused to hold that the federal Food Drug and Cosmetic Act ("FDCA") preempts state law failure to warn claims in cases where the pharmaceutical warning label is approved by the FDA. See Part III.A.6, infra.
Lilly's contention that these four plaintiffs' prescribing physicians were as a matter of fact aware of the risks of weight gain and diabetes posed by Zyprexa before the September 2003 label change is based on the particular facts of each of these four cases. Lilly has attempted to demonstrate that the four prescribing physicians' knowledge of the risks of weight gain and diabetes is indisputable. While the facts relating to the four physicians' state of knowledge supports Lilly's claim, plaintiffs have barely  but sufficiently under summary judgment standards  demonstrated that reasonable minds may differ on this point.
The strong constitutional right to a jury precludes a pretrial finding that no reasonable juror could find for any plaintiff except when a reasonable treating physician must have been fully aware of Zyprexa's dangers and those of competing drugs. Genuine issues exist as to material facts regarding the prescribing physicians' state of knowledge about the risks of diabetes and excessive weight gain associated with Zyprexa in three of the cases defendant moves to dismiss.
As to plaintiff Robert Cusella the record shows he was fully advised of Zyprexa's dangers, discussed the matter repeatedly with his doctor, and developed diabetes in close conjunction with the taking of Zyprexa. The state statute of limitations ran before he commenced his suit. See Appendix A; Part II.E.1, III.B.1, infra.
The following chart summarizes the conclusions described in more detail in Part III.B, infra.

-------------------------------------------------------------------------------------------
Plaintiff Date of First Use Date of Last Use Result
-------------------------------------------------------------------------------------------
Robert Cusella May 1997 April 2005 Case dismissed.
 Case was commenced
 more than two years
 after plaintiff learned he
 had diabetes and was
 aware that Zyprexa was
 a potential cause of his
 diabetes.
*248
Judith New April 2003 July 2005 Summary judgment
 denied.
Monty Souther June 1997 May 2005 Summary judgment
 denied.
Donna Worthington Aug 2003 Dec 2003 Summary judgment
 denied.
-------------------------------------------------------------------------------------------

II. Facts
A. Nature of Zyprexa
Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" anti-psychotics. It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the FDA in 1996. In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder.
B. FDA Labeling

1. September 2003 Label Change

In May of 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmalogical Drug Products ("DNDP") wrote to Lilly requesting additional safety information about Zyprexa. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. The parties disagree about whether the information given by Lilly to the FDA was complete and accurate.
On September 11, 2003, the FDA required a warning about risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed fox prescribing doctors, the label noted that epidemiological studies and other information indicated the relationship between the drug and hyperglycemia and diabetes were not yet fully understood. It reads:
WARNINGS
Hyperglycemia and Diabetes Mellitus
Hyperglycemia, in some cases extreme and associated with ketoacidosis or hypersomolar coma or death has been reported in patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . . Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood *249 glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing.
Curiously, the label did not mention weight gain or diabetes in the "warning to patients" section.
Lilly added the FDA required language to the Zyprexa label on September 16, 2003. It issued a press release announcing the label change on September 17, 2003. At the FDA's request, on March 1, 2004, Lilly sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change.

2. Consensus Statement of American Diabetes Association and Other Learned Groups

In November of 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA consensus conference") on the subject of the association between antipsychotic drugs and diabetes. An eight member panel heard presentations from 14 experts drawn from the fields of psychiatry, obesity, and diabetes; FDA representatives; and atypical antipsychotic drug manufacturers. The panel reviewed most of the relevant peer-reviewed English language scientific articles.
The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased risk of diabetes as compared to other atypical antipsychotic drugs The consensus statement declared that these relative risks as well as advantages of the individual drugs for individual patients in a heterogeneous population "should . . . influence drug choice." In part its report concluded:
There is considerable evidence, particularly in patients with schizophrenia, that treatment with [atypical antipsychotics] can cause a rapid increase in body weight in the first few months of therapy that may not reach a plateau even after 1 year of treatment. There is, however, considerable variability in weight gain among the various [atypical antipsychotics]. Clozapine [Clozaril] and olanzapine [Zyprexa] . . . produce the greatest weight gain.
* * *
Despite limitations in study design, the data consistently show an increased risk for diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa] compared with patients not receiving treatment with [first general antipsychotics] or with other [atypical antipsychotics]. The risk in patients taking risperidone and quetiapine is less clear; some studies show an increased risk for diabetes, while others do not. The two most recently approved [atypical anti-psychotics], aripiprazole and ziprasidone, have relatively limited epidemiological data, but available clinical trial experience with these drugs has not shown an increased risk for diabetes.
* * *
[T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical implications in this patient population and should . . . influence drug choice. Even for those medications associated with an increased risk of metabolic side effects, the benefit to specific patients could outweigh the potential risks. For example, clozapine [Clozaril] has unique benefits *250 for treatment-refractory patients and those at significant risk for suicidal behavior. Since treatment response in many psychiatric conditions is heterogeneous and unpredictable, physicians and patients can benefit from the availability of a broad array of different therapeutic agents.
* * *
These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely linked, and their prevalence appears to differ depending on the [atypical antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated with the greatest weight gain and highest occurrence of diabetes and dyslipidemia. Risperidone and quetiapine appear to have intermediate effects. Aripiprazole and ziprasidone are associated with little or no significant weight gain, diabetes, or dyslipidemia, although they have not been used as extensively as other agents. The choice of [atypical antipsychotic] for a specific patient depends on many factors. The likelihood of developing severe metabolic disease should also be an important consideration.

3. FDA March, 2007 Letter

On March 28, 2007, the FDA raised concerns about the adequacy of Zyprexa's warning label in a letter to Lilly.
[W]e are concerned that the labeling is deficient with regard to information about weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine [Zyprexa] use. . . . Our overall goal is to improve labeling with regard to these findings so that clinicians will be better informed on what the risks are for their patients. They cannot make reasonable treatment decisions until they have such information. We do not feel that current labeling for . . . Zyprexa provides sufficient information on these risks, and we fully intend to insure that . . . labels are enhanced with the best available information to characterize these risks.
C. International Zyprexa Labeling

1. Japan

Lilly began marketing Zyprexa in Japan in 2001. In April of 2002, after reports of 9 serious cases of hyperglycemia and diabetic ketoacidosis among Zyprexa users in Japan, the Japanese Ministry of Health Labor and Welfare required Lilly to issue to physicians an "Emergency Safety Information" letter about Zyprexa's risks. The Japanese agency further required that Zyprexa's warning be adjusted to include a contraindication against use of Zyprexa by diabetics and instructions to monitor patients' blood glucose with an initial fasting blood glucose test and periodic tests thereafter while they were using Zyprexa.

2. European Union, Australia, and Canada

Before the September 2003 change, Zyprexa's label contained more strongly-asserted warnings about the risk of developing diabetes in the European Union, Australia, and Canada than in the United States. The European Union's Agency for the Evaluation of Medicinal Products required Lilly to discuss the risks of hyperglycemia and diabetes in Zyprexa's label in 1999. Unlike the American label, the European Union label contained an explicit warning regarding diabetes, and the Australian and Canadian labels contained explicit precautions regarding diabetes.
D. Lilly's Promotion of Zyprexa

1. Pre-September 2003 Label

Lilly sales representatives marketed and promoted Zyprexa directly to physicians. *251 In the late nineteen nineties, as scientific studies began to posit a link between Zyprexa and hyperglycemia and diabetes, the sales department struggled to find an appropriate way to address those risks with physicians. In one internal email exchange in November 1998 within Lilly's medical marketing group, a salesperson suggested the following points be made in response to "recent reports linking the use of olanzapine [Zyprexa] and the development of diabetes": "Use of antipsychotics may result in weight gain. . . . Patients who gain weight may develop insulin resistance which may lead to hyperglycemia and diabetes."
In response to that suggestion, a senior executive within the medical group stated the following: "I do have concerns regarding making any connections between olanzapine [Zyprexa]-induced weight gain and hyperglycemia. Therefore, in my opinion, I would not include your following statement: `Patients who gain weight may develop insulin resistance which may lead to hyperglycemia and diabetes.'"
Zyprexa was approved by the FDA for treating schizophrenia and bipolar disorder, two conditions usually managed by psychiatrists. In late 2000, however, Lilly decided to begin directing its Zyprexa marketing efforts towards primary care physicians ("PCPs"). This strategy was outlined by the company as follows:
Following several months of study by the LillyUSA Zyprexa Brand Team, the affiliate approved the recommendation that Lilly actively promote Zyprexa to selected current primary care prescriber targets. . . . We believe there to be significant unmet medical need among office-based primary care physicians. . . . Zyprexa's profile is ideal for primary care (safe, simple, well-tolerated, effective, versatile). Zyprexa would enjoy first mover advantage in this segment. . . .
* * *
Challenges: Most PCPs currently prescribe a low volume of antipsychotics and mood stabilizers. Many PCPs will refer patients in need to psychotropic treatment to a specialist rather than treat the patient. Key barriers to uptake include PCP's lack of training in this category, limited time with patients, and an aversion to perceived risk. Zyprexa's primary indications  schizophrenia and bipolar  are not viewed as PCP-treated conditions, so there's not a specific indication for Lilly reps to promote in the PCP segment
* * *
Position: Zyprexa: The safe, proven solution in mood, thought, and behavioral disorders. We will emphasize safety to address barriers to adoption. . . . The word `solution' speaks to unmet medical need, and enables the PCP to take control of clinical situations that previously had led to referrals and/or poor outcomes. `Mental disorders' is intentionally broad and vague, providing latitude to frame the discussion around symptoms and behaviors rather than specific indications.

2. Post-September 2003 Label

After the September 2003 label change, see supra Part III.B.1, and the ADA Consensus Conference, see supra Part III.B.2, Lilly sales representatives remained reluctant to discuss the risk of diabetes with physicians. An internal Lilly presentation about Zyprexa and diabetes to sales representatives instructed: "This is a highly competitive driven issue. Therefore, we will NOT proactively address the diabetes *252 concern, but rather only when it arises from an MD." (emphasis in original).
Lilly salespeople apparently still continue to deny to physicians that Zyprexa "causes" weight gain and diabetes. For example, Lilly sales representative Susan Kay Schuler gave the following deposition testimony on this subject in February of 2007:
Q:. . . . [W]hen would you have first detailed Zyprexa?
A: July of 1999.
Q: Okay. And are you detailing Zyprexa today?
A. Yes.
* * *
Q: If you were to detail Zyprexa this week and a doctor was to ask you, Do I need to be concerned with Zyprexa causing diabetes, what would be your response?
A: It does not cause diabetes. There isn't any information or scientific information regarding Zyprexa causing diabetes.
* * *
Q: And can I ask what training you would have received that would have led you to that answer?
A: Direct meeting training.
Q: Training that was provided by Eli Lilly?
A: Correct.
* * *
Q: If the doctor were to ask you during your detailing this week, I need a yes or no answer, does Zyprexa cause weight gain, what would be your answer?
A: No.
* * *
Q: Since you started detailing in 1999, would the answer you just gave me about Zyprexa's connection with weight gain, would it have remained the same over the course of time?
A: Yes.
* * *
Q: A minute ago I asked you if a doctor were to ask you this week, while detailing, Does Zyprexa cause diabetes. . . . Would an answer to that question have remained the same over time since 1999?
A: Yes.
* * *
Q: Would you be surprised to hear Zyprexa is 12 times more likely to cause weight gain than the other anti-typical psychotics?
* * *
A: Yes.
* * *
Q: Has anyone ever told you or have you learned through your study of Zyprexa that an average person gained 24 pounds in 12 months while on Zyprexa?
A: No.
* * *
Q: Did anyone ever tell you or did you know that there were warnings in Japan over weight gain and the risk of diabetes with the use of Zyprexa a year-and-a-half prior to the warnings were [sic] received here in the United States?
* * *
A: No.

*253 Q: Do you have an understanding that weight gain causes diabetes?
* * *
A: No.
Q: As we sit here today, do you believe that Zyprexa affects blood sugar levels?
A: No.
* * *
Q: Are you familiar with the March 2004 `Dear Doctor' letter concerning diabetes and Zyprexa?
* * *
A: There have been many Dear Doctor letters, and I am not familiar with any one in particular because there have been more than one.
Q: Do Dear Doctor letters affect the message you present to the doctors while detailing?
A: No. The Dear Doctor letters typically come from the company. And we provide that letter. And if they have any questions, we're able to answer them.
Schuler Deposition, 13-62 (February 1, 2007).
Lilly salespeople generally do not admit that other atypical antipsychotic drugs may provide lesser risk of diabetes than Zyprexa. The Schuler deposition continued:
Q: If a doctor were to ask you that question in regard to Zyprexa, would  in light of Zyprexa, would you agree that treatment-emergent diabetes is comparable across agents?
A: Yes.
Q: Is that a statement that you could find anywhere currently in your  in your sell sheets or any other documents you carry?
A: Yes.
Id.
This response is contrary to the conclusion of the ADA Consensus Conference. See Part II.B.2, supra.
E. Plaintiffs

1. Robert Cusella

a) Patient History
Cusella is a fifty-six year old Pennsylvania resident who was diagnosed with schizophrenia in 1973. Def. Statement of Undisputed Material Facts for Robert Cusella, Ex. 1, 2 (hereinafter "Def. Stat. Cusella"); Id., Ex. 2, 20-21. Zyprexa was first prescribed for him in May of 1997. Id., Ex. 2, 57-58.
He was diagnosed with Type 2 non-insulin-dependent diabetes mellitus in or around September of 1996, before he first took Zyprexa. Id., Ex. 8, 12. He began to be treated with insulin in August of 1999. Id., Ex. 6, CUSELLAR_NFP_0066. Cusella alleges that Zyprexa caused a worsening in his condition so that he went from having non-insulin-dependent diabetes mellitus to having insulin-dependent diabetes mellitus. Id., Ex. 1, 12. He stopped taking Zyprexa in April of 2005. Id., Ex. 2, 121.
This plaintiff commenced an action against Lilly on April 12, 2006, in the Eastern District of New York.

b) Prescribing Physician's State of Knowledge
Cusella's psychiatrist, Dr. Peter Ganime, prescribed Zyprexa. Pl.'s Opp'n to Def.'s Mot. for Summ. J. Cusella, Ex. 51, 57-58 (hereinafter "Pl. Opp. Cusella"). Dr. Ganime has practiced psychiatry for forty years and is a Clinical Assistant Professor of Psychiatry at Robert Wood Johnson University of Medicine. See Appendix A, infra.
*254 Dr. Ganime knew that Cusella had non-insulin-dependent diabetes before he prescribed Zyprexa. Id., Ex. 51, 56-57. The doctor was aware of the various prescription drugs Cusella had used and other available drugs. Over the course of his treatment Cusella and his psychiatrist thoroughly discussed the problems of weight gain and the ongoing management of his diabetes by his primary care physician.
In September of 2002 Dr. Ganime raised with Cusella "recent controversies about Zyprexa and blood sugar elevation." Id., Ex. 51, 89-93. Dr. Ganime describes his conversation with Cusella as follows:
I talked to him about the fact that concerns had been raised about diabetes and blood sugar elevation. . . . discussed recent controversies about Zyprexa and blood sugar elevation. He was telling me that he was diabetic, and I told him that Zyprexa, you know, there were concerns about these medicines perhaps causing weight gain, perhaps raising blood sugar, and that we need to think about that. He told me a little bit about his current diabetes meds. . . . He said he wasn't losing weight. He admits to cheating on diet. And that when  that's when his blood sugar goes up, when he cheats on his diet. I know it's my fault, it's not the Zyprexa, he said.
* * *
Q: [D]id you disagree with Mr. Cusella?
A [Dr. Ganime]: No, I had to accept his reasoning. It seemed rational to me. It seemed reasonable.
Q: And if you had thought that continuation on Zyprexa was not rational and reasonable, I take it you wouldn't have continued to prescribe it?
A: I would have told him that. I also, you know, would have expected to hear something from the doctor who was treating him for diabetes, also. It's not unusual for a family doctor or another physician to call a psychiatrist and say, I really think this person shouldn't be taking his medication. And, of course, one would defer to that. I never received any communications like that.
Id.
In a subsequent deposition, Dr. Ganime elaborated on the information in his possession concerning the link between Zyprexa and weight gain and diabetes during the time he was treating Cusella:
Q: Now, Doctor, at no time did any representative from Eli Lilly tell you that the drug Zyrpexa is four times mores likely to cause diabetes than any of the other atypicals? Did they ever tell you that?
* * *
A [Dr. Ganime]: I don't have any recollection of anybody coming, tell me that, no.
Q: Were you ever advised by Eli Lilly representatives when you prescribed Zyprexa to Mr. Cusella that a patient would be 12 times more likely to have clinically significant weight gain on Zyprexa over placebo? Were you ever told that?
* * *
A: Eli Lilly had sent out information about the issues we're talking about, maintaining proper weight, eating properly, monitoring people who do have diabetes. I've never had a representative sitting there telling me twelve times this and four times that. Eli Lilly ultimately issued, as you know, a Dear Doctor warning letter sometime in March of 2004. And I don't recall the letter being that clear.

*255 * * *
Q: Do you ever remember being told by an Eli Lilly representative during 1997 to 2000 time period that the average weight gain on Zyprexa was 24 pounds in 12 months?
* * *
A: I don't remember what the representatives told me.
Q: Were you ever advised by an Eli Lilly representative not to administer Zyprexa to patients who have diabetes?
* * *
A: I never had an Eli Lilly representative tell me what to prescribe and what not to prescribe.
Q: All right. In 1997, that was the year that you first prescribed Zyprexa to Mr. Cusella, you were advised by the Eli Lilly pharmaceutical representatives that Lilly had already received 200 reports of increased blood sugar from adverse event reports from the use of Zyprexa?
A: The answer is no.
Q: Were you ever advised by Lilly representatives that in July of '00 in Europe warnings were given by Lilly concerning the risk of hyperglycemia?
* * *
A: No.
Id. Ex. 52, 21-23.
This treating psychiatrist was deposed at length. His deposition reflects an experienced physician knowledgeable about available medicines, sensitive to the needs of the patient, and committed to fully discussing relative benefits, risks and dangers with the patient. See Exhibit A, infra.

c) Representations Made by Lilly Salespeople to Dr. Ganime
Dina Bray was the Lilly sales representative assigned to Dr. Ganime. Neither Dr. Gamine nor Bray appear to remember any specific conversation between them. Bray has described generally the information she possessed and conveyed to doctors regarding Zyprexa's risks and side effects. She denied Zyprexa causes diabetes. Her deposition in part is as follows:
Q: If a doctor said to you, in the context of your detailing visit, "Zyprexa is associated with hyperglycemia," how would you respond?
A [Bray]: That's [sic] it's a class labeling, and that's in our package insert.
* * *
Q: Okay. Does Zyprexa cause diabetes?
A: Not to my knowledge, it doesn't.
* * *
Q: Do you believe that Zyprexa can affect blood sugar levels?

* * *
A: No.
* * *
Q: . . . Do you believe as you sit here today that there's a relationship between diabetes and Zyprexa?
A: No.
* * *
Q: At any time did Eli Lilly ever tell you that Zyprexa or olanz [sic] was one of the worst offenders for weight gain among atypical antipsychotics?

*256 A: Independent of it, no, no.
Id., 90-186.
Bray is currently employed by Lilly as a senior sales representative. Id. at 10. Her work had little if any effect on Dr. Ganime's treatment of Cusella.

2. Judith New

a) Patient History
Plaintiff Judith New is a forty-nine year old Florida resident who was diagnosed with schizophrenia around 2000 and 2001. Def. Statement of Undisputed Material Facts for Judith New, Ex. 3, 79 (hereinafter "Def. Stat. New"). Zyprexa was first prescribed for her in April of 2003. Id., Ex. 10, 23-25. She was diagnosed with type 2 diabetes mellitus in September of 2004, though her physician was unsure whether New then suffered from diabetes mellitus or impaired glucose tolerance, which is a precursor to diabetes mellitus. Id., Ex. 9, 29-30, 38.
New stopped taking Zyprexa in July of 2005. Id., Ex. 2, JN-04-000055. She subsequently resumed treatment with Zyprexa in October of 2005. Id., Ex. 6, 23-24. She finally discontinued use of Zyprexa in August of 2006. Pl.'s Opp'n to Def.'s Mot. for Summ. J. New, Ex. 55, NEWJ_ACI_0015.
This plaintiff commenced an action against Lilly on April 12, 2006, in the Eastern District of New York.

b) Prescribing Physician's State of Knowledge
No evidence has been presented regarding the doctor who first prescribed Zyprexa for New in April 2003. She began seeing the psychiatrist Dr. Nunez-Hinestrosa ("Dr. Nunez") in January of 2004. He continued her Zyprexa treatment. See Def. Stat. New, Ex. 6, 22. Dr. Nunez described his familiarity with Zyprexa's side effects and decision to continue Ms. New on the medication, partly because the patient did not wish to stay on an alternate drug he tried:
Q: During the time that you treated Judith New and prescribed Zyprexa for her, were you familiar with the contents of the Zyprexa insert that relate to certain metabolic issues?
A [Dr. Nunez]: Yes.
Q: And during that period of time, were you familiar with the contents of the insert as related to weight gain associated with Zyprexa use?
A: Yes.
Q: Were you familiar with the contents of the label relating to elevation in blood glucose levels?
A: Yes. . . . That change [sic] over time. When Zyprexa first came, it didn't have that. I don't think that we were aware of that during that 
* * *
Q: All right. And in Miss New's case, why did you prescribe Zyprexa for her?
A: When I took up her case, she was already on Zyprexa. And she was doing well, is what she would say, and she liked Zyprexa. Sometime in 2004 or beginnings of '05, I took her off, in part because of her weight gain and these things, and also because Medicare had some kind of problem with Zyprexa. . . . So we switched her to a different medication. She was on that medication for a while. And one day she came and told me that she didn't want that medication anymore. We tried to adjust it in a way that was helping her. But she didn't like it, complained of side effects. And one day [October 11, 2005] . . . [s]he came and told me that she wanted to go back on Zyprexa. . . . That same day we agreed to discontinue the Seroquel, that she conveyed that she would not continue *257 taking, and we resumed Zyprexa 15 milligrams and specifically . . . I explained . . . again the possible side effects, excessive weight gain, diabetes, hyperlipidemia of Zyprexa, and she insisted that's what she wanted.
Id. at 21-25 (quotation marks omitted).
Dr. Nunez was aware of the risks and benefits of Zyprexa. He believed the benefits to this patient outweighed the risks, as indicated by his deposition testimony.
Q: And in your opinion, with respect to this patient, do you believe that the benefits of Zyprexa outweigh the risks in terms of treating her illness?
A: Yes.
Id. at 25. For further parts of the Nunez and other treating physicians' depositions, see Appendix B, infra.

c). Representations Made by Lilly Salespeople
Ronnie Taylor was the Lilly sales representative assigned to promote Zyprexa to Dr. Nunez between 2000 and 2003. Taylor insisted to all the doctors he spoke to that the risks of weight gain and diabetes were comparable across all atypical antipsychotics:
Q: In the time frame 2000 to 2003 did any physician ever say to you, [y]our competition is saying Zyprexa is the worst offender for weight gain?
A: Every day.
Q: And how did you respond to that physician?
A: Well, Eli Lilly, at that point they had a detail piece that showed a comparison between Risperdal, Zyprexa, Depakote, Clozaril. It just showed basically a comparison between the two of weight gain and increase in the risk of that. And that's what you showed. I just went over it. I didn't focus on it. It's a class effect and the doctors knew it was a class effect; they was just trying to pull your chain. I didn't waste my time on that to these doctors.
* * *
Q: What was your understanding, in the class of atypical antipsychotics, where Zyprexa ranked in terms of being an offender for weight gain?
* * *
A: Yes, rank it either one, two, or three. It was pretty much  you know, according to the studies of what we had, it basically caused it no more than Clozaril or any of the rest of them. It was a class effect.
* * *
Q: Do you believe that Zyprexa can affect blood sugar levels?
* * *
A: Yes, I think it could, as a class.
Q: I'm sorry?
A: As well as the drugs in that class, yes, it could.
Q: What was your understanding of the risks regarding Zyprexa?
A: It was no more than any of the rest of them when you looked at the material that Lilly provided you to show to the physicians.
Q: And that is  and those risks would be weight gain and diabetes?
* * *
A: Well, it was according to what the material was and it would show a comparison between Zyprexa and the other drugs as compared to weight gain and as compared to the risk of diabetes. So, again, we are talking about two separate issues, and the company provided the material to show the physicians.

*258 * * *
Q: You testified a few times in your deposition that diabetes was comparable for all atypical antipsychotics?
A: Yes.
Q: Do you remember saying that?
A: I sure do, yes.
Deposition of R. Taylor (Dec. 26, 2006), 64-65, 87-88, 95-97, 173.
Taylor continues to believe that Zyprexa does not cause diabetes.
A: I would not sit here and tell you that Zyprexa causes diabetes. I would sit here and tell you that schizophrenia as a group, or mental illness as a group, the incidence of diabetes is greater in those particular groups than it is in general population.
Id. at 89.
Taylor left his position at Lilly on December 31, 2005.
From 2004 onwards, Michael Bolinder was the Lilly sales representative assigned to Dr. Nunez. He does not believe there is a causal relationship between Zyprexa and diabetes:
Q: Okay. I take it that at some point in time, and we've kind of talked about this already, the issue of the association between Zyprexa and diabetes or causing diabetes came to your attention and was something that you were taught about and learned about and talked to doctors about; is that correct?
* * *
A: What I would say is with regard to Zyprexa, quote/unquote, causing diabetes, I don't think that I've ever seen any material that shows a direct connection between Zyprexa causing diabetes. However, as we've talked about previously, we did have a body of evidence that suggested that chronic severe mentally ill patients tend to be in a population or a subpopulation of a general population that are more prone to higher instances of hyperglycemia and diabetes.
Q: And would that fact be one of the responses that you would talk to a doctor about if you were discussing whether there was a relationship between diabetes and Zyprexa.
* * *
A: I think similar to what I said earlier with regard to if somebody said they had a concern about diabetes and Zyprexa, I would share with them, like I mentioned earlier, the data that we had suggested, that while it's an epidemic  while diabetes is an epidemic in the general population, it appeared that this particular subset of the population tend to be prone to increased risk of diabetes. But we never, at least the data that we had at our disposal didn't show any particular increased risk for patients on any given atypical antipsychotic.
* * *
Q: And then after the label change, did you ever say to a doctor that one of the risks of Zyprexa is that your patient may develop diabetes?
* * *
A: My recollection  I don't have a specific recollection of ever stating it necessarily in the way that you state the question. However, my recollection is that we proactively discussed the fact that that patient subset or that population  subset of the population of these patients that were treated on atypical antipsychotics were at an increased risk for developing diabetes. And, you know, we didn't see a correlation between any one particular agent, or at *259 least the FDA didn't see a correlation in the data they observed, and when they worded that warning, there was no direct correlation between any one agent.
Deposition of Michael Bolinder (Dec. 15, 2006), 83-89.

3. Monty Souther

a) Patient History
Plaintiff Monty Souther is a 50-year old resident of North Carolina who suffers from bipolar disorder, among other psychiatric illnesses. Def. Statement of Undisputed Material Facts for Monty Souther, Ex. 9, 6, 11 (hereinafter "Def. Stat. Souther"). Zyprexa was prescribed for him in June of 1997. Id., Ex. 9, 17.
Souther contends that he was diagnosed with diabetes in May of 2003. His physician's memory of the precise diagnosis is hazy:
Q: And so at that time in May of 2003, Doctor, . . . were you actually diagnosing him with diabetes or not?
A: Sort of, kind of, probably not.
Q: Probably not?
A: But headed that way. I would say right now he had  impaired glucose metabolism is what I would call it now, although at that time the term wasn't around. That descriptive term wasn't used yet.
Id., Ex. 8, 30-31.
Souther stopped taking Zyprexa around May of 2005. Id., Ex. 1; Pl.'s Opp'n to Def.'s Mot. for Summ. J. Souther, Ex. 50, 128 (hereinafter "Pl. Opp. Souther"). He commenced an action against Lilly on April 12, 2006, in the Eastern District of New York.

b) Prescribing Physicians' State of Knowledge
Souther was first prescribed Zyprexa by Dr. Thaddeus Kostrubala in July of 1997. Pl. Opp. Souther, Ex. 51, 17. Dr. Kostrubala has described his knowledge of Zyprexa's risks, and discussion of those risks with Souther, as follows:
Q:. . . . there anything particular about Zyprexa at that time that set it apart from any of the other ones?
A [Dr. Kostrubala]: . . . My recollection of it, it was considered a safe medication . . .
Q: Okay. And what about the side effects? What do you recall were the side effects that were 
A: I don't recall now. I would have to have the data in front of me. . . . But basically, the information I used would coming from other data [besides that communicated by Lilly sales representatives]. And what I'm talking about is such  for example, the PDR, the information provided explicitly by the drug company, conferences, as well as discussions with other physicians and psychiatrists.
Q: All right. Do you recall whether you had the opportunity back then to read any studies that had been done about Zyprexa?
A: I don't recall.
Q: All right. And can I assume that you were busy practicing psychiatrist, and were not doing your own independent research on Zyprexa?
A: No, I was not.
* * *
Q: . . . Doctor, when you discussed the risks and benefits of Zyprexa with Mr. Souther, did you  do you recall discussing with him that Zyprexa carried with it a risk of weight gain, hyperglycemia and diabetes?
* * *
A: I don't recall that at all.

*260 Q: Do you recall whether you were aware that Zyprexa carried with it a risk of the development of weight gain, hyperglycemia and diabetes?
* * *
A: It does not stand out in my mind, no.
* * *
Q: But if you had been aware back in 1997, when you were prescribing Zyprexa to Mr. Souther, that Zyprexa carried a risk four times greater than any of the other what I'll call atypical antipsychotic medications, would you have discussed that fact with Mr. Souther before prescribing it to him?
* * *
A: If I had known that, I certain would have.
Q: Okay. And if you had known that there were other drugs available at that time that were equally effective to Zyprexa, but did not carry that type of a risk for hyperglycemia, weight gain and diabetes, would you have started him out on the other medication?
* * *
A: Yes.
Id., Ex. 51, 24-29.
In November 1998, Souther began seeing Dr. Lynda Weston, a psychiatrist, who continued to treat him with Zyprexa. Dr. Weston does not recall specifically the knowledge she had of the risks of weight gain, hyperglycemia, and diabetes posed by Zyprexa during the period between 1998 and 2002, the time she treated Souther. Id., Ex. 52, 18-20, 24. She described what she does remember as follows:
Q: And what were the other salespeople saying back in '96 and '97 with regard to Zyprexa? The non-Lilly salespeople. . . . what were they saying?
A: Well, they would primarily point out the positive points of their medication.
Q: . . . But would they touch on weight-relative weight gain?
A: That came later. . . . After it was out for a little while, that became in issue. And that was one of the selling points for some of the other products. . . . .
Q: And [Souther's] weight gain, did you attribute that to the use of the Zyprexa?
A: It's hard to say whether I did at that time or not. Whether were  we were probably beginning to notice that some with Zyprexa, but weight gain in psychiatric patients has always been a concern.
* * *
Q:. . . . Were you aware that Zyprexa was causing more weight gain than other atypical antipsychotics?
A: It appeared to be the case.
Q: And the information where you learned that from, you did that on your own; is that a fair statement?
A: Well, we observed it in patients.
* * *
Q: Do you agree with me that the diabetes rates are not the same for all atypicals?
A: I don't know.
Q: Is that something you would want to know when you're prescribing a drug?
A: It would certainly be nice to know.
Id., Ex. 53, 46, 51.
From September 2002 until May 2005, Souther was treated by Dr. Michael Nunn, a psychiatrist, who continued to prescribe Zyprexa. See Appendix D, infra.

*261 c) Representations Made by Lilly Salespeople
Susan Kay Schuler was the Lilly sales representative assigned to Dr. Nunn. Schuler's deposition testimony is referred to in Part ILD.2, supra.

4. Donna Worthington

a) Patient History
Plaintiff Donna Worthington is a fifty-seven year old North Carolina resident who was diagnosed with bipolar disorder in October of 2001. See Def. Statement of Undisputed Material Facts for Donna Worthington, Ex. 1, 1 (hereinafter "Def. Stat. Worthington"); Id., Ex. 6, WORTHINGTOND_DGHI_0003. She was first prescribed Zyprexa to treat her bipolar disorder in on August 5, 2003. Id., Ex. 7, WORTHINGTOND_OBHH_0013.
In December 2003, Worthington's glucose level was tested and found to be above the normal range. In light of the high level, and potential association between Zyprexa and diabetes, Worthington's physician discontinued her Zyprexa treatment. Pl.'s Opp'n to Def.'s Mot. for Summ. J. Worthington, Ex. 53, 27-29 (hereinafter "Pl. Opp. Worthington") ("Given the risk of elevated gluclose with Zyprexa, we decided to discontinue this medication."); Worthington was diagnosed with diabetes on April 13, 2004. Id., Ex. 9, WORTHINGTOND_POWELLL-0008.
Worthington commenced this action against Lilly on April 12, 2006, in the Eastern District of New York.

b) Prescribing Physician's State of Knowledge
Worthington was first prescribed Zyprexa by Dr. Deborah Ross in August of 2003. Dr. Ross has testified that she was not aware of a connection between Zyprexa and diabetes at that time:
Q:. . . . I asked you before did you advise [Worthington] of the increased risk of diabetes and you said. . . . you did not the first time . . . did you at discharge or at 
A [Dr. Ross]: No.
Q:  any other time?
A: No. It wasn't that clear then that that was a risk for this drug.
* * *
Q: All right. And do you have any recollection of reading anything in the PDR [Physicians' Desk Reference] about the risks of diabetes from taking Zyprexa?
A: I don't  I don't remember at that time reading it.
Q: Okay.
A: I think it was sometime later.
Q: Okay. All right. Had you known, had it been written in the PDR. . . . that Zyprexa carried with it a four times greater risk of weight gain, hyperglycemia and diabetes than any of the other atypical antipsychotics. . . . would you have considered that in your making your decision as to whether or not to prescribe Zyprexa?
* * *
A: I consider all risk factors for all drugs, but at the time . . . of the drugs that were available, I felt this was going to be the most effective to getting her mania controlled, and that was the primary problem she came to me with.
Q: All right. Well, how about answer  the question is would  would that information have affected the way that you assess your risk/benefit analysis.
A: Oh, sure.

*262 * * *
Q: [W]hen you had the risk/benefit discussion with the patient. . . . prior to prescribing it, would that be something you would have told the patient?
A: Yeah, I'm sure.
Q: And if you had that information and if you went ahead and prescribed Zyprexa anyway, do you think would have perhaps monitored the . . . blood sugar levels of the patients?
A: Down the road, not within five days. They're not going to change that quickly.
Q: Okay. But at some point if they're 
A: Yeah.
Q:  still on the drug, you want to 
A: Yes.
Q:  do that?
A: And we do that now.
Pl. Opp. Worthington, Ex. 51, 63-64. See Appendix E, infra.

c) Representations Made by Lilly Salespeople
It can be assumed for purposes of this motion that representations were made by Lilly's salespeople to Dr. Ross, similar to those described in Part II.D.2, supra.
III. Summary Judgment
A. Law

1. Summary Judgment Standard

a) Generally
Summary judgment is appropriate only if "there is no genuine issue as to any material fact . . . [in which case] the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Mitchell v. Washingtonville Central School District, 190 F.3d 1, 5 (2d Cir.1999).
The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. Goenaga v. March of Dimes Birth Defects Fund., 51 F.3d 14, 18 (2d Cir.1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. See Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture[.]" Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996); see also Delaware & Hudson Ry. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").
Peripheral factual disputes will not defeat an otherwise properly supported motion for summary judgment. Anderson, 477 U.S. at 247, 106 S.Ct. 2505. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S.Ct. 2505.
In deciding the motion, all inferences from, and ambiguities in, the underlying facts are to be resolved in favor of the party opposing summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only when reasonable minds could not differ as to the import of the proffered evidence is summary judgment proper. See Anderson, 477 U.S. at 250-52, 106 S.Ct. 2505; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991).
"In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d *263 Cir.1986). Critical is recognition of the jury's fact-finding primacy:
It is well established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.
Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir.2003) (quotation marks omitted).

b) Right to a Jury
The Seventh Amendment of the Constitution protects the right to a jury trial. It reads: "In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.
The Seventh Amendment "was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." See Galloway v. United States, 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); Ex parte Peterson, 253 U.S. 300, 309-12, 40 S.Ct. 543, 64 L.Ed. 919 (1920). The late Chief Justice Rehnquist nonetheless observed that whatever procedural changes are made, they cannot be allowed to invade the "jury's province"  its fact-finding power. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 345-46, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting).
Yet, the jury has had some of its fact-finding authority attenuated indirectly through various evolving "procedural devices." Fed.R.Evid. 104(a) (judicial discretion to bar evidence that fails conditional relevancy); Fed.R.Evid. 403 (judicial discretion to bar cumulative, irrelevant, prejudicial information); Edward J. Imwinkelried, Trial Judges  Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate The Credibility and Weight of the Testimony?, 84 Marg. L.Rev. 1, 7 (2000) (Daubert may limit jury's fact finding role); Lisa S. Meyer, Taking the "Complexity" Out of Complex Litigation: Preserving the Constitutional Right to a Civil Jury Trial, 28 Val. U.L.Rev. 337 (1993) (juries replaced by bench trials in complex cases). The increasing use of bench trials, Daubert hearings, summary judgments, and directed verdicts  as authorized by rules of practice and appellate courts  to limit jury fact finding and set aside verdicts poses a threat to the continued viability of the Seventh Amendment jury trial. See Suja A. Thomas, Why Summary Judgment is Unconstitutional, 93 Va. L.Rev. 139 (2007); Adam Liptak, Cases Keep Flowing In, But the Jury Pool is Idle, N.Y. Times, April 30, 2007, at A14 ("Jury trials may be expensive and time-consuming, but the jury, local and populist, is a counterweight to central authority and is as important an element in the constitutional balance as the two houses of Congress, the three branches of government and the federal system itself.").
Prematurely disposing of a case before the jury can pass on it generally favors defendants, who do not have the burden of proof on most issues, leading not only to a violation of the Constitution, but a tilting of the scales of justice away from injured *264 plaintiffs. See, e.g., Samuel Issacharoff & George Lowenstein, Second Thoughts About Sitmmary Judgment, 100 Yale L.J. 73, 75 (1990) ("[L]iberalized summary judgment inhibits the filing of otherwise meritorious suits and results in a wealth transfer from plaintiffs as a class to defendants as a class."); Jeffrey W. Stempel, A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process, 49 Ohio St. L.J. 95, 99 (1988) (describing Supreme Court's 1986 trilogy of summary judgment cases as "faulty and ill-conceived in light of the purposes for which the civil litigation system exists"); John Caher, Court Seen As Slow In Expanding Tort Claims, Criminal Defendant's Rights, N.Y.L.J., Jul. 24, 2001, at 1 (describing trend against private litigants in decisions by New York Court of Appeals); Kevin M. Clermont & Theodore Eisenberg, Appeal from Jury or Judge Trial: Defendants' Advantage, 3 Am. L. & Econ. Rev. 125, 128 (2001) (appellate courts are more inclined to overturn plaintiffs verdicts because of perceived pro-plaintiff bias by juries); Kevin M. Clermont & Theodore Eisenberg, Anti-Plaintiff Bias in the Federal Appellate Courts, 84 Judicature 128 (2000) (same). Courts must ensure that this anti-jury trend does not go so far as to bar deserving plaintiffs from relief in federal court.

2. Choice of Law

A number of states' laws as well as general American rules are discussed below to provide context, and because of the other pending cases, even though the precedents are not controlling in the four cases before the court on summary judgment motions.

a) Substance
Federal courts sitting in diversity jurisdiction apply the forum state's choice of substantive law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The first step in any choice of law inquiry is to determine whether there is an actual conflict between the laws invoked by the parties. Booking v. General Star Mgmt. Co., 254 F.3d 414, 419 (2d Cir.2001). If there is a conflict, the a district court sitting in New York must classify the conflicting laws by subject matter with reference to New York law. Id. at 420. In general, New York law requires courts to apply the law of the jurisdiction having "the most significant contacts with the matter in dispute." Auten v. Auten, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954).

b) Statute of Limitations
A court sitting in diversity applies the statute of limitations of the state in which it sits. "Where a cause of action accrues outside New York in favor of a nonresident, the foreign statute of limitations is borrowed." Besser v. E.R. Squibb & Sons, Inc., 146 A.D.2d 107, 539 N.Y.S.2d 734, 737 (N.Y.App.Div.1989) (internal quotations marks omitted). Codified in section 202 of New York's Civil Practice Law and Rules, this rule is primarily intended to prevent forum shopping by nonresident plaintiffs. See N.Y.C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."); Antone v. General Motors Corp., 64 N.Y.2d 20, 484 N.Y.S.2d 514, 473 N.E.2d 742, 745 (1984) ("The primary purpose of CPLR 202 and its predecessors is to prevent forum shopping by a nonresident seeking to take advantage of a more favorable Statute of Limitations in New York."); National Surety Co. v. Ruffin, *265 242 N.Y. 413, 152 N.E. 246, 247 (1926) ("The obvious purpose of the provision as a whole is to prevent a nonresident claimant from coming into this state and prosecuting a claim whether against a resident or a nonresident under our statutes of limitations if they are more favorable to him than the statutes prevailing in the state where the cause of action arose.") (discussing CPLR 202's predecessor).

3. Florida Law

a) The Learned Intermediary Doctrine
The learned intermediary doctrine is discussed under the law of each state whose law is applicable. As in Florida, it is one recognized generally throughout the county. See, e.g., J.D. Lee and Barry A. Lindahl, Modern Tort Law § 27:45 (2d ed.2002). Prosser and Keeton put the special problems of pharmaceuticals and treating physicians as follows:
The marketing situation as regards prescription drugs and vaccines is a unique one. The ultimate purchaser for use and the person for whose benefit the drug or vaccine is utilized is not the person who selects and orders the drug. This is the prescribing physician who is an expert. There is another unique feature or circumstance and this is the role of the federal government through the Federal Drug Administration. In the process, other agencies have been given the responsibility of establishing standards for a general class of products of like kind, but here the drug approval process involves a complex and often ad hoc balancing of imponderable and incommensurate factors related to danger and utility of marketing a specific new drug. This is because of the substantial risk of serious harm or death from the use of prescription drugs for the prevention and treatment of diseases. Virtually all courts have agreed that there can be no breach of duty to warn on any theory  negligence or strict liability for breach of warranty or in tort  until such time as a producer or other seller knew or should have known in the exercise of ordinary care of the risk or hazard not warned about. The producer's basic responsibility in this area is to provide adequate warnings to physicians. It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy.
Prosser and Keeton on the Law of Torts, 688 (5th ed.1984) (footnote omitted).
The doctor has the obligation to be informed about the risks and benefits of the drugs prescribed and must inform the patient of known risks and benefits. See Foister v. Purdue Pharma, LP, 295 F.Supp.2d 693, 706 (E.D.Ky.2003) (finding that the learned intermediary doctrine severs the liability of a pharmaceutical company where the prescribing doctor has been adequately warned of risks). One writer has noted:
It is sometimes said that the physician should disclose the diagnosis, the general nature of the contemplated procedure, the material risks involved in the procedure, the probability of success associated with the procedure, the prognosis if the procedure is not carried out, and the existence and risks of any alternatives to the procedure.
Dan B. Dobbs, The Law of Torts, 659 (2001). The list is not exclusive.
Under Florida law, the manufacturer of a product has a general duty to warn users of any dangers inherent in or associated with its use. See Zanzuri v. G.D. Searle & Co., 748 F.Supp. 1511, 1514 (S.D.Fla.1990) (applying Florida tort law to suit brought against manufacturer of an intrauterine copper contraceptive). "One exception to this rule, however, is the *266 `learned intermediary' doctrine, whereby the manufacturer of a prescription drug discharges its duty to warn by providing an adequate warning to the prescribing physician." Zanzuri, 748 F.Supp. at 1514; see also Upjohn Co. v. MacMurdo, 562 So.2d 680, 683 (Fla.1990) ("The manufacturer's duty to warn of the drugs dangerous side effects is directed to the physician rather than the patient."); Buckner v. Allergan Pharms., Inc., 400 So.2d 820, 822 (Fla.App.1981) ("A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs.").
A prescribing physician who has been adequately warned about the drugs' risks breaks "the causal link between the manufacturer and the plaintiff, thereby insulating the manufacturer from tort liability for harm caused by the drug." Zanzuri, 748 F.Supp. at 1515. Florida courts base this rule on the following rationale: "the prescribing physician, acting as a `learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patient's needs." Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 104 (Fla.1989).
An adequate prescription drug label warning to physicians is sufficient to break the causal link between the patient and drug manufacturer. "Whether the physician in fact reads the warning, or passes its contents along to the recipient of the drug is irrelevant." E.R. Squibb & Sons, Inc. v. Farnes, 697 So.2d 825, 827 (Fla.1997).

b) Adequacy of Warning
The question of whether a prescription drug warning adequately informs prescribing physicians of the risks inherent in the drug is one of fact, ordinarily determined by a jury. See Upjohn, 562 So.2d at 683 ("the adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony"); Felix, 540 So.2d at 105 ("whether a warning is adequate is usually a jury question"). Where the warning is "accurate, clear, and unambiguous," its adequacy becomes a question of law. See Felix, 540 So.2d at 105 ("While in many instances the adequacy of warnings concerning drugs is a question of fact, we hold that it can become a question of law where the warning is accurate, clear, and unambiguous.").

c) Statute of Limitations
Florida allows a plaintiff with a cause of action, such as the one here, founded in negligence, four years to commence suit. See Fla. Stat. Ann. § 95.11(3). Under Florida law, the "delayed discovery doctrine" postpones the accrual date of a cause of action "until the plaintiff knows or reasonably should know of the tortious act giving rise to the cause of action." Hearndon v. Graham, 767 So.2d 1179, 1184 (Fla. 2000); Ryan v. Lobo De Gonzalez, 841 So.2d 510, 516-17 (Fla.Dist.Ct.App.2003). The purpose of tolling is to protect "blameless ignorance," and to uphold "the traditional purposes of statutes of limitations," which "require the assertion of claims within a specified period of time after notice of the invasion of legal rights." Hearndon, 767 So.2d at 1184 (quoting Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (emphasis supplied)).
In Florida, there is a statutory basis for application of the delayed discovery doctrine. *267 See Davis v. Monahan, 832 So.2d 708, 711 (Fla.2002). Under the applicable Florida statute, "[a]n action for products liability . . . must be begun within the period prescribed in this chapter, with the period running from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence." Fla. Stat. Ann. § 95.031(3).

4. Pennsylvania Law

a) The Learned Intermediary Doctrine
Pennsylvania "imposes strict liability on the seller of any product `in a defective condition unreasonably dangerous to the user or consumer."' Incollingo v. Ewing, 444 Pa. 263, 444 Pa. 299, 282 A.2d 206, 219 (1971) (quoting Restatement (Second) of Torts § 402A); see also Part III.A.3.a, supra. Products whose risks can be ameliorated by an adequate warning are considered to be "in a defective condition" only when sold without such a warning. See Incollingo, 282 A.2d at 219 ("The seller of such products . . . with the qualification that they are properly prepared and properly marketed and proper warning is given . . . is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product attended with a known but apparently reasonable risk."); Brecher v. Cutler, 396 Pa.Super. 211, 578 A.2d 481, 485 (1990) ("A manufacturer will be held liable only if he fails to exercise reasonable care to inform the one for whose use the product is supplied of the facts which make it likely to be dangerous.").
"It is clear that the manufacturer of a prescription drug known to be dangerous for its intended use, has a duty to exercise reasonable care to inform those for whose use the article was supplied of the facts which make the product likely to be dangerous." Makripodis v. Merrell-Dow Pharm., Inc., 361 Pa.Super. 589, 523 A.2d 374, 378 (1987) (quotation omitted). The intended user of a prescription drug is considered to be the prescribing physician. See, e.g., Rosci v. AcroMed, Inc., 447 Pa.Super. 403, 669 A.2d 959, 969 (1995). "In the case of prescription drugs, the warning required is not to the general public or to the consumer but rather to the prescribing doctor." Makripodis, 523 A.2d at 377; see also Incollingo, 282 A.2d at 220 ("Since the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor.").
[T]he warnings which are required to be given by the manufacturer must be directed to the physician, not the patient-consumer. This is so because it is the duty of the prescribing physician to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug.
Makripodis, 523 A.2d at 378; see also Leibowitz v. Ortho Pharm. Corp., 224 Pa.Super. 418, 307 A.2d 449 (1973) ("It is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug.").
A prescribing physician is "expected to make an independent medical *268 judgment in determining whether a given drug is appropriate for a particular patient." Brecher, 578 A.2d at 485 (emphasis supplied). Thus, "[u]nder the learned intermediary doctrine, as it is applied in Pennsylvania, a [prescription drug] manufacturer will be held liable only where it fails to exercise reasonable care to inform [the prescribing physician] of the facts which make the product likely to be dangerous." Rosci, 669 A.2d at 969.

b) Adequacy of Warning
"Whether a product is defective because of a failure to give an adequate warning is initially a question of law to be decided by the trial court." Fletcher v. Raymond Corp., 424 Pa.Super. 605, 623 A.2d 845, 848 (1993); see also Demmler v. SmithKline Beecham Corp., 448 Pa.Super. 425, 671 A.2d 1151, 1154 (1996). A warning should not be deemed inadequate because of revelations subsequent to its issuance. Leibowitz, 307 A.2d at 458. Where proof exists, however, that the manufacturer "was ignorant in obtaining information readily ascertainable to it, a package insert or label will be considered inadequate, and liability accordingly imposed." Id. at 459.
In the case of prescription thugs, expert medical testimony is often relied upon "to determine whether the drug manufacturer's warning to the medical community is adequate because prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect." Demmler, 671 A.2d at 1154.
Pennsylvania has "recognized a cause of action against drug manufacturers for the overpromotion of a drug that nullify [sic] otherwise adequate warnings." Baldino v. Castagna, 505 Pa. 239, 478 A.2d 807, 810 (1984). Manufacturers who promote prescription drugs in a manner that neutralizes printed warnings breach their duty of reasonable care. Id. In order to defeat a motion for summary judgment, an assertion of overpromotion must be well-supported factually. See Brecher, 578 A.2d at 486 ("appellants failed to factually support their assertion that the aggressive promotion of the Cu-7 nullified the warnings as to Dr. Cutler, therefore, appellants' arguments against entry of summary judgment must fail").

c) Statute of Limitations
Pennsylvania imposes a two year statute of limitations on negligence claims. See 42 Pa.C.S.A. § 5524(7). That statute begins running "as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." Pocono Int'l Raceway v. Pocono Produce, Inc., 503 Pa. 80, 468 A.2d 468, 471 (1983). The Pennsylvania statute is strictly construed to bar an action unless an applicable exception to the rule acts to toll its running. Id.
Pennsylvania recognizes a "discovery rule" exception to its two-year statute of limitations for negligence actions. Under the discovery rule, where a plaintiff is unable, despite exercising due diligence, to discover her injury or its cause, the statute of limitations is tolled. See Fine v. Checcio, 582 Pa. 253, 870 A.2d 850, 858-59 (2005); Pocono Int'l Raceway, 468 A.2d at 471; Ayers v. Morgan, 397 Pa. 282, 154 A.2d 788, 791-92 (1959); see also Calle v. York Hosp., 232 F.Supp.2d 353, 357-58 (M.D.Pa.2002). The burden is on the party seeking application of the discovery rule to prove inability to gain knowledge of the injury despite the exercise of due diligence. See Dalrymple v. Brown, 549 Pa. 217, 701 A.2d 164, 167 (1997). "The very essence of the discovery rule in Pennsylvania is that it applies only to those situations where the nature of the injury itself is such that no amount of *269 vigilance will enable a plaintiff to detect an injury." Id. at 170; Pocono Int'l Raceway, 468 A.2d at 471 (discovery rule designed to protect "blameless ignorance"). "It is not relevant to the discovery rules [sic] application whether or not the prescribed period has expired. . . ." Fine, 870 A.2d at 859.

5. North Carolina Law

a) The Learned Intermediary Doctrine
Products liability claims in North Carolina are governed by section 99B of the North Carolina General Statutes, which provides that "no manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction. . . ." N.C. Gen.Stat. § 99B-5(a); see also Part III.A.3.a, supra. In the case of prescription drugs, manufacturers have a duty to warn the prescribing physician, rather than the patient, about the risks associated with the particular drug. See Salmon v. Parke, Davis & Co., 520 F.2d 1359, 1362 (4th Cir.1975) ("A manufacturer of an ethical drug must exercise reasonable care, commensurate with the risk, to warn physicians effectively of the drug's inherent dangers.") (applying North Carolina law); Foyle By and Through McMillan v. Lederle Labs., 674 F.Supp. 530, 535-36 (E.D.N.C.1987) ("[W]hen prescription drugs are used, the manufacturer's duty to warn does not extend to the patient."); Holley v. Burroughs Wellcome Co., 74 N.C.App. 736, 330 S.E.2d 228, 233 (1985) ("[T]he standard of care or duty allegedly owed by defendants to [plaintiff] was to warn the personnel responsible for his [treatment] of the risk[s]" attending the treatment.)
Under the learned intermediary doctrine, patients of an adequately warned prescribing physician cannot maintain a products liability action against a drug manufacturer because "a manufacturer or seller of a prescription drug has no legal duty to warn a patient of the dangerous tendencies of its drug, as long as sufficient warnings are provided to the prescribing physician." Dellinger v. Pfizer, Inc., No. 5:03CV95, 2006 WL 2057654, *6 (W.D.N.C. July 19, 2006). This common law doctrine has been codified by the state legislature:
[N]o manufacturer or seller of a prescription drug shall be liable in a products liability action for failing to provide a warning or instruction directly to a consumer if an adequate warning or instruction has been provided to the physician or other legally authorized person who prescribes or dispenses that prescription drug for the claimant. . . .
N.C. Gen.Stat. § 99B-5(c).

b) Adequacy of Warning
A seller or manufacturer must act unreasonably to be held liable for failure to provide adequate warning under North Carolina law. See N.C. Gen.Stat. § 995(a). "No manufacturer or seller of a product shall be held liable in any product liability action for failing to warn about an open and obvious risk or a risk that is a matter of common knowledge." See id. § 99B-5(b). Where the evidence that the prescribing physician was adequately warned is not contradicted, the drug manufacturer has satisfied its duty to warn the learned intermediary and summary judgment may be granted. See Baraukas v. Danek Medical, Inc., No. 6:97cv00613, 2000 WL 223508, *4 (M.D.N.C. Jan.13, 2000); Foyle, 674 F.Supp. at 536.

c) Statute of Limitations
In North Carolina, "where bodily injury or a defect in property is an `essential *270 element of the plaintiffs cause of action,' N.C. Gen.Stat. § 1-52(16) is the appropriate statute of limitations." Humble v. Sara Lee Corp., 168 N.C.App. 595, 608 S.E.2d 416, 416 (2005) (quoting Bernick v. Jurden, 306 N.C. 435, 293 S.E.2d 405, 411-12 (1982)). Section 1-52(16) of the North Carolina General Statutes imposes a three-year statute of limitations on products liability actions. A cause of action for negligence, in North Carolina, "shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant, whichever event occurs first. Provided that no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action." Id.; Moore v. Coachmen Indus., Inc., 129 N.C.App. 389, 499 S.E.2d 772, 777-78 (1998) (claim against manufacturer of recreational vehicle that was destroyed in a fire accrued on date of fire). This statutory "discovery rule" extends the statute of limitations, and "is intended to apply in situations where the injury becomes apparent only after some delay, c'. the claimant might be somehow prevented from realizing the injury." Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., 636 S.E.2d 835, 840 (N.C.Ct.App.2006).

6. Application of Federal Law

a) Preemption

i) FDA Preamble
On January 24, 2006, the FDA issued a final rule governing the "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products." 71 Fed.Reg. 3922 (Jan. 24, 2006) (hereinafter "Final Rule"). The Final Rule adds new labeling requirements meant to "make it easier for health care professionals to access, read, and use information in prescription drug labeling" and "enhance the safe and effective use of prescription drug products and reduce the number of adverse reactions resulting from medication errors due to misunderstood or incorrectly applied drug information." 71 Fed.Reg. at 3922. The Final Rule became effective on June 30, 2006. Id.
In the Preamble to the Final Rule (the "Preamble"), the FDA expressed great concern over the recent spate of products liability actions against prescription drug manufacturers and the impact of those cases on its own regulation of prescription drugs:
State law actions . . . threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs. State actions are not characterized by centralized expert evaluation of drug regulatory issues. Instead, they encourage, and in fact require, lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public  the central role of FDA  sometimes on behalf of a single individual or group of individuals. That individualized reevaluation of the benefits and risks of a product can result in relief  including the threat of significant damage awards or penalties  that creates pressure on manufacturers to attempt to add warnings that FDA has neither approved nor found to be scientifically required. This could encourage manufacturers to propose "defensive labeling" to avoid State liability, which, if implemented, could result in scientifically unsubstantiated warnings and underutilization of beneficial treatments.
Id. at 3935. In view of these concerns, the FDA declared in the Preamble that state law causes of action based upon a theory of inadequate warning where the warning has *271 been approved by the FDA are preempted by federal law. This conflict preemption is not limited to claims brought against manufacturers: the Preamble states that conflict preemption analysis applies with equal force to actions "against health care practitioners for claims related to dissemination of risk information to patients beyond what is included in the labeling." Id. at 3935-36.
Nearly every court to have considered the issue of federal preemption before the Preamble was issued has rejected the FDA's current position. The agency maintains that this results from a "misunderstanding of the act encouraged by State law actions . . . that FDA labeling requirements represent a minimum safety standard." Id. at 3934. According to the FDA, the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), 21 U.S.C. § 301 et seq., establishes both a floor and ceiling as to the adequacy of warning labels.
Lilly argues that, irrespective of the factual merits of plaintiffs' state law claims, it is entitled to summary judgment as a matter of law on the theory that the Final Rule and accompanying Preamble preempt any and all state law causes of action based upon failure to adequately warn, where the warning label has been approved or directed by the FDA, as is the case with Zyprexa. Lilly maintains that allowing states to impose liability for failure to warn despite FDA approval of the warning label would force drug manufacturers to add language to their warning labels that could expose them to liability for misbranding under the FDCA. See 21 U.S.C. § 352.

ii) FDA Regulation of Prescription Drug Warning Labels
Pursuant to the FDCA, the FDA is charged with the obligation to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner." 21 U.S.C. § 393(b)(1). Encompassed within such products are prescription drugs intended for human consumption. Id. § 393(b)(2)(B). The powers to (1) approve proposed warning labels to ensure that drugs are safe and effective, see id. § 355, and (2) institute enforcement actions against manufacturers for issuing false or misleading labels, see id. § 352, are included within the FDA's delegated authority.
FDA regulations require that prescription drug manufacturers meet a series of stringent labeling requirements. See 21 C.F.R. §§ 201.56 to 201.57. The manufacturer must indicate among other things warnings and precautions, contraindications, dosage information, adverse reactions, and interactions with other prescription drugs., Id. § 201.56. When new information regarding the risks associated with a drug is available to the manufacturer, the drug's labeling must be changed, regardless of whether a causal link between the drug and a newly-discovered risk has been definitively proved. See id. § 201.57(c)(6)(i) ("the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established.").
Once a label has been approved, the FDA permits two types of labeling changes. Major changes require the prior approval of the FDA. Id. §§ 314.70(b), 601.12(f)(1). Manufacturers are permitted to unilaterally change warning labels in a "minor" way without prior approval, so long as the agency is notified of the changes. Such changes are specifically defined to include strengthening language regarding warnings, contraindications, precautions, *272 or adverse reactions. See id. § 314.70(c)(6)(iii)(A) (labeling changes may be made without prior approval "[t]o add or strengthen a contraindication, warning, precaution or adverse reaction.").

iii) Deference Due FDA's Interpretation
An administrative agency's interpretations of the statutory scheme it administers are entitled to substantial deference, unless Congress has directly spoken on the issue. See Chevron USA, Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The agency's interpretation of the law is entitled to Chevron deference only if "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). An agency's statements clarifying ambiguities in its own regulations are entitled to the level of deference described by the Supreme Court in Auer v. Robbins, rather than the Chevron standard. See Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); see also Christensen v. Harris County, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Auer deference is warranted only when the language of the regulation is ambiguous.").
If an agency interpretation lacks the "power to control"  because it was not promulgated in the exercise of congressionally-delegated authority under Chevron, or does not resolve an ambiguity in a previously issued regulation under Auer  it serves as guidance for litigants, but will only be respected by the court to the extent that it has the "power to persuade":
[R]ulings, interpretations and opinions of the [administrative agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity in its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See also Mead, 533 U.S. at 228, 121 S.Ct. 2164. When an agency's regulations directly conflict with its own prior interpretations the deference due decreases significantly. See Skidmore, 323 U.S. at 140, 65 S.Ct. 161.

iv) FDCA Preemption of State Law Causes of Action
In fields traditionally occupied by the states, such as health and safety regulation, there is a strong presumption against federal preemption. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654-55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); Hillsborough County v. Automated Med. Labs. Inc., 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). To overcome the presumption, the party urging preemption must show that either (1) Congress or an agency with delegated authority has expressly stated that preemption is intended ("express preemption"), see Medtronic, 518 U.S. at 484-85, 116 S.Ct. 2240; Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); or (2) Congress intended to occupy the field ("field preemption"), see Travelers, 514 U.S. at 654, 115 S.Ct. 1671; or (3) state causes of action conflict with federal objectives to such a large degree that harmony between the two becomes impossible *273 ("conflict preemption"). Hillsborough County, 471 U.S. at 715, 105 S.Ct. 2371.
"[A]n agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption." Desiano v. Warner-Lambert & Co., 467 F.3d 85, 97 n. 9 (2d Cir.2006) (citations omitted). See also Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption. If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent "more clearly."); Medtronic, 518 U.S. at 487, 116 S.Ct. 2240 ("It is, to say the least, difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.") (quotations omitted). As Justice Scalia has noted, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." Alexander v. Sandoval, 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Cf. Matthew C. Stephenson, The Strategic Substitution Effect: Textual Plausibility, Procedural Formality, and Judicial Review of Agency Statutory Interpretations, 120 Harv. L Rev. 529, 536 (2006) (suggesting that an administrative agency such as the federal Food and Drug Administration would want to enhance its power to nationalize control of pharmaceuticals, implying a reduction of state tort interjections into the process, thus introducing doubt about the neutrality of its preemption conclusion).

b) Preemption of State Failure to Warn Claims

i) The Preamble Does Not Control the Question of Preemption
The Preamble accompanying the Final Rule is not entitled to deference under Chevron or Auer, and controls this court only insofar as it has the "power to persuade." The FDA lacks the authority to supply the legislative intent required to overcome the presumption against preemption in this case, removing it from those agency interpretations that receive deference under Chevron. See Bates, 544 U.S. at 449, 125 S.Ct. 1788; Medtronic, 518 U.S. at 487, 116 S.Ct. 2240; Desiano, 467 F.3d at 97 n. 9.
The Preamble's assertion of preemption is not persuasive. First, prior interpretations of the FDCA by the FDA contradict the current view adopted by the agency. In a 2000 Proposal of the same amendments at issue in this case, see 65 Fed.Reg. 81082 (Dec. 22, 2000), the FDA explicitly stated that it "ha[d] determined that this proposed rule does not contain policies that have federalism implications or that preempt State law." Id. at 81103. Similarly, in a 1998 Final Rule relating to the provision of labeling directly to patients for certain prescription drugs and other biological products, the FDA noted:
Some comments contended that the provision of patient labeling would adversely affect the legal liability of manufacturers, physicians, pharmacists, and other prescribers or dispensers of prescription drug products by abrogating the "learned intermediary doctrine." Some comments urged that FDA provide for Federal preemption of State regulation with respect to civil tort liability claims and other labeling requirements. The comment claimed that without preemption, FDA would encourage "failure to warn" claims and challenges to patient labeling, especially compared to professional labeling.
Tort liability can not be a major consideration for FDA which must be guided *274 by the basic principles and requirements of the act in its regulatory activities. Nevertheless, FDA does not believe this rule would adversely affect civil tort liability. . . .
* * *
FDA does not believe that the evolution of state tort law will cause the developments of standards that would be at odds with the agency's regulations.
63 Fed.Reg. 66378, 66383-84 (Dec. 1, 1998). There is a lack of harmonization between the 1998-2000 interpretation and the 2006 Preamble. Even those courts persuaded by the FDA's current position have noted that the prior interpretations are "difficult to reconcile [with] the FDA's current position." Colacicco v. Apotex, Inc., 432 F.Supp.2d 514, 531 (E.D.Pa.2006). The inconsistency undercuts Chevron deference and attenuates persuasiveness under Skidmore.
Courts have generally rejected the argument that the FDA labeling approval process somehow preempts state law adequacy of warning claims. See, e.g., Desiano, 467 F.3d at 97 & n. 9; Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 537-38 (6th Cir.1993); Hill v. Searle Labs., 884 F.2d 1064, 1068 (8th Cir.1989); Brochu v. Ortho Pharm. Corp., 642 F.2d 652, 658 (1st Cir.1981); Perry v. Novartis Pharm. Corp., 456 F.Supp.2d 678, 685 (E.D.Pa. 2006); Adesina v. Aladan Corp., 438 F.Supp.2d 329, 337-38 (S.D.N.Y.2006); Witczak v. Pfizer, Inc., 377 F.Supp.2d 726, 731-32 (D.Minn.2005); Motus v. Pfizer, Inc., 127 F.Supp.2d 1085 (C.D.Cal.2000); Jones by Jones v. Lederle Labs., 695 F.Supp. 700, 709-11 (E.D.N.Y.1988); Stephens v. G.D. Searle & Co., 602 F.Supp. 379, 382 (E.D.Mich.1985); MacDonald v. Ortho Pharm. Corp., 394 Mass. 131, 475 N.E.2d 65, 70-71 (1985).
A majority of courts have held that the FDA's labeling requirements represent only minimum safety standards and do not absolve prescription drug manufacturers of liability. See, e.g., Hill, 884 F.2d at 1068 ("FDA approval is not a shield to liability."); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745-46 (11th Cir.1986); Salmon v. Parke, Davis & Co., 520 F.2d 1359, 1362 (4th Cir.1975); Caraker v. Sandoz Pharm. Corp., 172 F.Supp.2d 1018, 1033 (S.D.Ill. 2001) ("[T]he FDA's drug labeling decisions impose only `minimum' standards that are open to supplementation by state law through a jury's verdict enforcing a manufacturer's common law duty to warn.") (citations omitted); Motus, 127 F.Supp.2d at 1092; Kociemba v. G.D. Searle & Co., 680 F.Supp. 1293, 1299 (D.Minn.1988) ("FDA regulation of prescription drugs establishes minimum standards, both as to design and warning.") (citations omitted); Edwards v. Basel Pharm., 933 P.2d 298, 302 (Okla.1997); Savina v. Sterling Drug, Inc., 247 Kan. 105, 795 P.2d 915, 931 (1990). The FDA's position that the Preamble "represents the government's long standing views on preemption," 71 Fed.Reg. at 3934, is inconsistent with the fact that the FDA earlier echoed the many courts' decisions rejecting preemption.
FDA regulations themselves militate against deferring to the Preamble's statement of the Final Rule's preemptive effect. The 2006 Preamble is, by regulation, an advisory opinion, binding only on the agency and changeable at any time without notice and comment. See 21 C.F.R. § 10.85(d)(1), (e), (g). The Supreme Court has ruled that internal agency guidelines which are not promulgated subject to notice and comment procedures are entitled only to "some deference." See Reno v. Koray, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995).

*275 ii) State Law Failure to Warn Claims are Not Preempted
The regulation of public health is an area traditionally occupied by the states, supporting a presumption against preemption in this case. See Travelers, 514 U.S. at 654-55, 115 S.Ct. 1671. That presumption has not been overcome in this case. Plaintiffs' state-law adequacy of warning claims are not preempted.
The required clear statement of legislative intent to preempt is lacking. Bates, 544 U.S. at 449, 125 S.Ct. 1788; Medtronic, 518 U.S. at 487, 116 S.Ct. 2240; Desiano, 467 F.3d at 97 n. 9. Despite repeated urging by Lilly to dismiss the Second Circuit Court of Appeals' discussion of the Preamble in Desiano as obiter dictum, the reasoning in that case remains persuasive. In Desiano, the Court of Appeals addressed a Michigan law that immunizes drug manufacturers from liability for drugs approved by the FDA, but excepts them from that immunity if they make misrepresentations to or withhold information from the agency. See Mich. Comp. Laws § 2946(5); Desiano, 467 F.3d at 87-88. Defendant Warner-Lambert & Co., manufacturer of Rezulin (a diabetes drug linked to liver damage that has been withdrawn from the United States market), claimed that portions of the FDCA and Medical Device Amendments of 1976, 21 U.S.C. § 360c et seq. ("MDA"), preempted the fraud exception to Michigan's immunity statute. Plaintiffs maintained that their state-law tort claims remained viable. Id. at 88-89. The court rejected preemption, noting that "[t]he Michigan legislature's desire to rein in state-based tort liability falls squarely within its prerogative to regulate matters of health and safety, which is a sphere in which the presumption against preemption applies, indeed, stands at its strongest." Id. at 94 (internal citations and quotation marks omitted). Although not relied upon by the defendant in Desiano, the appellate court nonetheless took notice of the Preamble at issue here, and expressed doubt over its preemptive force:
[W]hatever deference would be owed an agency's view in contexts where a presumption against preemption does apply, it is arguable that an agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption. Because we find that a presumption against preemption applies in the instant case, it may also be argued that even in the face of an FDA statement asserting preemption, the common law claims preserved by Michigan's immunity exception cannot be preempted by federal law absent a clear statement from Congress.
Id. at 97 n. 9. The need for a "clear statement from Congress" is imperative where, as in this case, a finding of preemption "will foreclose a remedy that was traditionally available and for which federal law provides no substitute." Perry, 456 F.Supp.2d at 684. See also Bates, 544 U.S. at 449-50, 125 S.Ct. 1788. The FDA cannot be allowed to usher in such a sweeping change in substantive law through the back door. Cf. Jackson v. Pfizer, Inc., 432 F.Supp.2d 964, 968 n. 3 (D.Neb.2006) ("The FDA failed to comply with its requirements to communicate with the states and to allow the states an opportunity to participate in the proceedings prior to a preemption decision." (citing Executive Order 13132 § 4(c)-(e))).
Where Congress has preempted the states' traditional regulation of public health, it has done so explicitly. Two federal statutes passed in this area contain express preemption provisions, in clear contrast to the FDCA. The Medical Device Amendments to the FDCA, passed to regulate *276 medical devices "from bedpans to brainscans," Medtronic, 518 U.S. at 476, 116 S.Ct. 2240 (internal citations and quotations omitted), includes an express preemption provision. See 21 U.S.C. § 360k(a) ("Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue with respect to a device intended for human use any requirement (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."). Similarly, the National Childhood Vaccine Injury Compensation Act of 1986 ("Vaccine Act"), 42 U.S.C. § 300aa-1 et seq., was enacted to "provide compensation for victims of childhood vaccines" and to promote the development and availability of vaccines by "offset[ing] the vicissitudes of the tort system." Sykes v. Glaxo-SmithKline, 484 F.Supp.2d 289, 297 (E.D.Pa.2007) (holding failure to warn claims relating to brain damage to child, allegedly suffered due to vaccination with defendant's product, expressly preempted by Vaccine Act); Jones v. Lederie Laboratories, 785 F.Supp. 1123 (E.D.N.Y.1992) (vaccine not defective since no safer drug was available). To effectuate this goal, Congress included an express supersedure clause within the Vaccine Act. See 42 U.S.C. § 300aa-22.
Congress has not spoken on the issue of preemption as related to prescription drugs, and this silence is telling. While a direct statement of legislative intent is not essential for preemption, it would be odd for Congress to include express preemption provisions in amendments to the FDCA regarding state-law tort claims in certain contexts (i.e. for medical devices) if it intended all FDCA claims to be preempted.
There is no actual conflict between plaintiffs' claims and federal law. FDA labeling regulations and state law adequacy of warning claims have existed harmoniously from the time the FDCA was first enacted. Where a state law requirement necessitated violation of the FDCA, a direct conflict would exist and the state law could be preempted under the theory of conflict preemption. For example, if a state, by positive law, required a drug manufacturer to include a warning within the labeling for its product that the FDA had previously rejected as scientifically unsubstantiated, that inclusion could expose the manufacturer to liability for misbranding, see 21 U.S.C. § 352. A direct conflict would then result between state and federal law, something impermissible under the FDCA or any other act of Congress. See Perry, 456 F.Supp.2d at 685-86 ("Where, however, the FDA has made a conclusive determination, positive or negative, as to the existence of a link between the drug at issue and some adverse health consequence, state law cannot mandate that a manufacturer include additional warning beyond those that the FDA has determine to be appropriate to the risk."). See also Bates, 544 U.S. at 453-54, 125 S.Ct. 1788 (discussing whether Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq., preempts state-law adequacy of warning claims against herbicide manufacturer) ("For example, were the Court of Appeals to determine that the element of falsity in Texas' common-law definition of fraud imposed a broader obligation than FIFRA's requirement that labels not contain false or misleading statements, that state-law cause of action would be preempted. . . . ").
By contrast, a jury verdict finding Lilly negligent for failure to warn of Zyprexa's risks would not compel the company to do anything. Cf. Bates, 544 U.S. at 444, 125 *277 S.Ct. 1788 ("None of these common-law rules requires that manufacturers label or package their products in any particular way."). Jury verdicts do not impose mandatory labeling requirements on drug manufacturers; rather, they impose damages for negligence in particular cases. The manufacturer can change its labels through FDA procedure in response to such a verdict, or it can choose to leave the label as-is despite the verdict.
Jury verdicts and adequacy of warning claims serve an important regulatory role in the tort system. State law adequacy of warning claims may alert the FDA to potential inadequacies in product labeling. The current litigation against Lilly may be a testament to that fact. See Letter from FDA to Eli Lilly & Co. (Mar. 28, 2007).
In any event, the type of failure to warn claim at issue here may not even fall within the Preamble's ambit of purportedly preempted claims. Of the six categories of preempted state-law listed in the Preamble, the one pertinent here includes "claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or in advertising, the substance of which had been proposed to FDA for inclusion in labeling, if that statement was not required by FDA at the time plaintiff claims the sponsor had an obligation to warn." 71 Fed.Reg. at 3934 (emphasis supplied). This language suggests that the FDA would consider preempted only those state-law adequacy of warning claims which seek to impose liability for failure to include labeling language already rejected by the FDA. See Perry, 456 F.Supp.2d at 684. Lilly has not proposed statements for inclusion in labeling relating to the increased risks of hyperglycemia and diabetes associated with Zyprexa. Lilly, and other manufacturers of atypical antipsychotics, were compelled by the FDA to include such statements by the September 2003 labeling directive. Even if the Preamble had preemptive force, plaintiffs' failure to warn claims are arguably not the type contemplated by the FDA as preempted.
The lesson of prescription drug tort litigation cautions against permitting the FDA to sweepingly remove adequacy of warning claims from the prescription drug regulatory landscape:
Notwithstanding the structural inability of the FDA to carefully investigate and monitor drug safety, drug makers assert a preemption defense premised on the notion that FDA approval of a drug indicates a validation of the drug's safety. This position shirks the responsibility of drug manufacturers to carefully monitor the adverse effects of their products. One could reasonably assume that Vioxx might still be on the market if Merck had not been concerned about its financial exposure in products liability lawsuits.
The availability of courts to redress injuries provides the public powerful leverage against negligent drug manufacturers. The threat of litigation reduces the risk of misconduct by drug makers, providing the public with necessary protections against the effects of dangerous pharmaceuticals. If courts extended federal preemption to drug claims . . . manufacturers would have little incentive to conduct post-approval clinical studies to examine a drug's safety. The FDA would also lose one of its few bargaining chips in pressuring companies to amend labels to warn of newly discovered risks.
Jonathan V. O'Steen & Van O'Steen, The FDA Defense: Vioxx and the Argument Against Federal Preemption of State Claims for Injuries Resulting from Defective Drugs, 48 Ariz. L.Rev. 67, 94 (2006). As the Supreme Court has noted, "labels *278 will evolve over time, as manufacturers gain more information about their products' performance in diverse settings. . . . [T]ort suits can serve as a catalyst in this process." Bates, 544 U.S. at 451, 125 S.Ct. 1788 (rejecting preemption challenge to state-law claims that warnings on herbicide labeling were inadequate, despite presence of an express preemption clause).

7. Damages Issues

It is contemplated that the normal charges on damages from failure to warn of dangers of a product either negligently or deliberately will be given to the jury. They will be modified by explaining the role of the jury in applying the rules of proportionality. See Part I.B.2 and I.B.3, supra.
Epidemiological and other relevant scientific factors are subject to good faith differing conclusions. See Part IV, infra. Under these circumstances, punitive damages appear not to be available. This issue has not been briefed and may be raised by motion before the trial begins.
B. Application of Law to Facts

1. Robert Cusella

a) Choice of Law
Cusella, a Pennsylvania resident, was diagnosed with Type 2 non-insulin dependent diabetes mellitus in September 1996. Afflicted with mental heath problems for the majority of his adult life, Cusella was prescribed Zyprexa by Dr. Ganime, a well-qualified Pennsylvania psychiatrist. The plaintiff had been hospitalized for acute paranoia, delusions, and psychosis in May 1997. See Def. Stat. Cusella, 2-11, 34. Cusella developed insulin-dependent diabetes in August of 1999, and alleges that this worsening of his condition was a direct result of his Zyprexa use. Id. 1135. Because Pennsylvania has the most significant contacts with Cusella's claims, the law of that state controls Lilly's motion for summary judgment on those claims. See Auten, 308 N.Y. at 160, 124 N.E.2d 99.

b) Statute of Limitations
Diabetes developed and Zyprexa was prescribed years before the September 2003 label change. At least from the date of March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician. Since Lilly's duty to warn ran to Dr. Gamine rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus behind Cusella's insulin-dependancy in the first place.
Dr. Ganime's medical records and deposition testimony, see Ex. A, show that Cusella was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly may not have been adequate to absolve Lilly of liability to Cusella, those warnings Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.
Measured either against the date Cusella developed diabetes  August 1999  or the latest possible date Dr. Gamine was aware of the potential causal connection between Zyprexa and diabetes  March 2004  Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006. Cusella's suit is time barred.

c) Adequacy of Warning Post-September 2003 Label Change
For a full discussion of whether Mr. Cusella's physician was adequately warned *279 of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, see Part II.E.1.b supra; Part III.B.5, and Appendix A, infra.

d) Deposition of Treating Physician.
See Appendix A, infra.

e) Summary Judgment Decision
The motion for summary judgment against Robert Cusella is granted.

2. Judith New

a) Choice of Law
Judith New was prescribed Zyprexa and developed diabetes in Florida. See Def. Stat. New ¶¶ 24, 39. Because the state of Florida has the most significant contacts with New's claims, Florida tort law governs her product liability action against Lilly. See Auten, 308 N.Y. at 160, 124 N.E.2d 99.

b) Statute of Limitations
New was diagnosed with diabetes in September 2004. She commenced this action against Lilly on April 12, 2006, well within Florida's four-year limitations period for negligence claims. See Part III. A.3.c., supra. New's claim is not time-barred.

c) Adequacy of Warning Post-September 2003 Label Change
For a discussion of whether Ms. New's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, see Part II. E.2.b, supra; Part III.B.5, and Appendix B, infra.

d) Deposition of Treating Physician
See Appendix B, infra.

e) Summary Judgment Decision
Summary judgment is denied. Disputed material questions of fact exist concerning the issue of whether the warning provided by Lilly to New's physician was adequate, particularly when viewed in light of the position its salespeople were taking, to convey the risks of weight gain, hyperglycemia, and diabetes.

3. Monty Souther

a) Choice of Law
Monty Souther's diagnosis with bipolar disorder and other psychiatric illnesses, his treatment for those illnesses with Zyprexa, and his development and diagnosis of diabetes all occurred in North Carolina. See Pl's Ex. 60, Aff. of Monty Souther, at ¶¶ 2-6. Because North Carolina has the most significant contacts with Souther's claims, the law of that state controls Lilly's motion for summary judgment on those claims. Auten, 308 N.Y. at 160, 124 N.E.2d 99.

b) Statute of Limitations
Souther began taking Zyprexa in 1997. He was diagnosed with diabetes on in May of 2003, see Def. Stat. Souther, Ex. 8. He commenced this action against Lilly on April 12, 2006, before North Carolina's three-year statute of limitations for negligence actions had run. See Part III.A.5.c, supra. Souther's claim is not time-barred.

c) Adequacy of Warning Post-September 2003 Label Change
For a full discussion of whether Souther's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, see Part II.E.3.d, supra; Part III.B.5, and Appendix C, infra.

d) Deposition of Treating Physician.
See Appendix C, infra.

e) Summary Judgment Decision
Summary judgment is denied. Disputed material questions of fact exist *280 concern the issue of whether the warning provided by Lilly to Souther's physician was adequate, particularly when viewed in light of the position its salespeople were taking, to convey the risks of weight gain, hyperglycemia, and diabetes.

4. Donna Worthington

a) Choice of Law
Donna Worthington's treatment with Zyprexa and diagnosis with diabetes both occurred in North Carolina. See Def. Stat. Worthington ¶¶ 11, 18. Since North Carolina has the most significant contacts with Worthington's claims, the law of that state controls Lilly's motion for summary judgment as to Worthington. See Auten, 308 N.Y. at 160, 124 N.E.2d 99

b) Statute of Limitations
Worthington was diagnosed with diabetes on April 13, 2004, see Def. Stet. Worthington ¶ 11. She commenced this action against Lilly on April 12, 2006, before North Carolina's three-year statute of limitations for negligence actions had run. See Part III.A.5.c, supra. Worthington's claim is not time-barred.

c) Adequacy of Warning Post-September 2003 Label Change
For a full discussion of whether Ms. Worthington's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, see Part II.E.4.d supra; Part III.B.5, and Appendix D, infra.

d) Deposition of Treating Physician.
See Appendix D, infra.

e) Summary Judgment Decision
Summary judgment is denied. Disputed material questions of fact exist concern the issue of whether the warning provided by Lilly to Worthington's physician was adequate, particularly when viewed in light of the position its salespeople were taking, to convey the risks of weight gain, hyperglycemia, and diabetes.

5. Adequacy of the September 2003 Label

The adequacy of the Zyprexa warning label approved by the FDA in September of 2003 is a question of fact for the jury. See, e.g., Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 105 (Fla. 1989) ("whether a warning is adequate is usually a jury question"). In the absence of a finding that the warning provided by Lilly about Zyprexa's risks was adequate, no state's tort law insulates Lilly from liability under the learned intermediary doctrine. See, e.g., Ziglar v. E.I. Du Pont De Nemours and Co., 53 N.C.App. 147, 155, 280 S.E.2d 510 (1981) ("It is well-established that a product is defective if it is not accompanied by adequate warnings of the dangers associated with its use. . . ."); Leibowitz v. Ortho Pharmaceutical Corp., 224 Pa.Super. 418, 307 A.2d 449, 459 (1973) ("a drug manufacturer may not escape liability by merely ignoring existing reports of side-effects or dangers in the use of its product"); Incollingo v. Ewing, 444 Pa. 263, 444 Pa. 299, 282 A.2d 206, 220 (1971) (describing the issue of prescription drug manufacturer liability as centering on "whether the warning that was given to the prescribing doctors was proper and adequate"); Rosci v. AcroMed, Inc., 447 Pa.Super. 403, 669 A.2d 959, 969 (1995) ("Under the learned intermediary doctrine, as it is applied in Pennsylvania, a manufacturer will be held liable only where it fails to exercise reasonable care to inform the one for whose use the product is supplied of the facts which make the product likely to be dangerous. . . . The intended `user' in a case involving a prescription drug . . . is . . . the prescribing physician."); Zanzuri v. G.D. Searle & Co., *281 748 F.Supp. 1511, 1515 (S.D.Fla.1990) ("[I]n Florida, the manufacturer of a prescription drug must provide the prescribing physician with an adequate warning. The properly warned physician then becomes a `learned intermediary' operating to break the causal link between the manufacturer and plaintiff, thereby insulting the manufacturer from tort liability for harm caused by the drug."); Buckner v. Allergan Pharmaceuticals, Inc., 400 So.2d 820, 822 (Fla.App.1981) ("A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense, and administer prescription drugs.").
In evaluating the adequacy of the September 2003 warning label, the jury may be guided by the parties' experts as well as the more neutral expert opinion of the FDA, which approved the warning. See, e.g., Upjohn Co. v. MacMurdo, 562 So.2d 680, 683 (Fla.1990) ("the adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony"); Demmler v. SmithKline Beecham Corp., 448 Pa.Super. 425, 671 A.2d 1151, 1154 (1996) ("Generally, expert medical testimony is required to determine whether the drug manufacturer's warning to the medical community is adequate because prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect."); Leibowitz, 307 A.2d at 457 ("In approving a drug for marketing purposes, the F.D.A. is ever mindful of risks inherent in the use of a proposed drug. It also approves same because of the benefit said drug may have for the public as a whole.").
IV. Admissibility of Expert Evidence
A. Motions Regarding Admissibility of Expert Reports
Each side has opposed the admissibility of some of the opponent's expert opinions on Daubert grounds. None of these challenges has merit.
B. Rules 702 and 703 of the Federal Rules of Evidence
The key provisions are rules 702 and 703 of the Federal Rules of Evidence, embodying the basic principles of Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). They are: Rule 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Rule 703:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their *282 probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.
In some instances the experts arc also fact witnesses, requiring satisfaction of Rule 701 of the Federal Rules of Evidence covering opinions of non-experts. See, e.g., Asplundh Mfg. Div. v. Benton Harbor Eng., 57 F.3d 1190 (3d Cir.1995) (lay and expert witness on design of product); Daniel J. Capra, Distinguishing Between Lay Witnesses and Experts, N.Y.L.J., March 13, 1998, p. 3.
While a detailed analysis for such in limine matters is not required, a gatekeeping function is conferred upon the district court by the Rules of Evidence. Daubert, and the guidelines set forth in Rule 104(a) governing decisions on witness qualifications and admissibility of evidence, suggest a preliminary determination that the testimony of experts expected to testify is or is not helpful to the tier of fact, reliable from an evidentiary standpoint, and relevant to the issues in the case. The method for determining the reliability of such testimony is within the discretion of the district court. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). It should make a suitable inquiry before reaching its determinations. Id. The inquiry may be a "flexible one," with the ultimate goal of assuring that proffered expert testimony is scientifically acceptable and relevant, as well as otherwise reliable from an evidentiary standpoint. See Daubert, 509 U.S. at 594-95, 113 S.Ct. 2786. Since "Rule 702 embodies a liberal standard of admissibility for expert opinions," Nimely v. City of New York, 414 F.3d 381, 395-396 (2d Cir. 2005), the assumption the court starts with is that a well qualified expert's testimony is admissible. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and "are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." Daubert, 509 U.S. at 596, 113 S.Ct. 2786. The party who presents an expert bears the burden of proving each element necessary to the admissibility of that expert's testimony and report. See Daubert, 509 U.S. at 592, 113 S.Ct. 2786; Fed.R.Evid. 702 advisory committee note (2000).
C. Qualifications of Expert Witnesses
Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education. See Fed.R.Evid. 702. In keeping with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to `opinion' testimony," Daubert, 509 U.S. at 588-89, 113 S.Ct. 2786, the standard for qualifying expert witnesses is liberal. Assertions that the witness lacks particular educational or other experiential background, "go to the weight, not the admissibility, of [the] testimony." McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir.1995). If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. See, e.g., Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 80 (2d Cir.1997) (expert witness qualified when experience, knowledge, or training related to general area, not to specific question before trier of fact).
D. Helpfulness and Relevance
In deciding whether to allow the witness to give expert testimony the primary issue is whether the expertise provides the witness with the ability to assist the finder of *283 fact in deciding the issues before it. This inquiry is subsumed within the broader "relevance" analysis governed by Rule 401. The Daubert court described this consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. Daubert, 509 U.S. at 591-92, 113 S.Ct. 2786. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "[T]he Rules' basic standard of relevance . . . is a liberal one," Daubert, 509 U.S. at 587, 113 S.Ct. 2786. The decision to admit or exclude on these grounds is within the trial court's discretion. See United States v. Aminy, 15 F.3d 258, 261 (2d Cir.1994).
In inquiring into the potential helpfulness of the proffered expert testimony, the court decides whether it concerns matters requiring assistance to the kind of people expected to sit on the jury. See United States v. Mulder, 273 F.3d 91, 101-02 (2d Cir.2001). The evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. See also Daubert, 509 U.S. at 591, 113 S.Ct. 2786.
Expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations. Neither should it include conclusory testimony that "undertakes to tell the jury what result to reach . . . [or] attempts to substitute the expert's judgment for the jury's." United States v. Duncan, 42 F.3d 97, 101 (2d Cir.1994). Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case even if it simply explains facts and evidence already in the record. See Mulder, 273 F.3d at 101-02.
After determining that the requirements of general helpfulness and specific "fit" are met, the court engages "in a balancing . . . to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice." United States v. Jakobetz, 955 F.2d 786, 794 (2d Cir.1992); Fed.R.Evid. 403. Because "expert evidence can be both powerful and quite misleading," the court, in weighing possible prejudice against probative force under Rule 403, "exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595, 113 S.Ct. 2786. See also Nimely, 414 F.3d at 397 ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."). In deciding possible probative value of the expert's proposed testimony against the potential for confusion or over-reliance by the jury, it cannot be assumed that a jury of this district "will be so dazzled or swayed as to ignore evidence suggesting that an experiment was improperly conducted or that testing procedures have not been established." Jakobetz, 955 F.2d at 797.
E. Reliability
The most challenging and controversial gatekeeping role, as set out in Daubert and elaborated in Kumho, is that of ascertaining the reliability of proffered testimony, or "whether the reasoning or methodology underlying the testimony is scientifically valid." Daubert, 509 U.S. at 592, 113 S.Ct. 2786. This is partly because "[u]nlike an ordinary witness [governed by Rule 701], an expert is permitted wide latitude to offer opinions, *284 including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 590, 113 S.Ct. 2783. The exception made for such experts "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Id.
The Daubert court supplied the following nonexhaustive guidelines for analysis of the reliability of expert testimony: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance" within the scientific community. Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786. These guidelines are not to be construed as a "definitive checklist." Id. at 593, 113 S.Ct. 2786. The applicability of any one factor will depend "upon the particular circumstances of the particular case at issue." Kumho, 526 U.S. at 137, 119 S.Ct. 1167.
While, preferably, the content of the expert's testimony will grow "naturally and directly out of research [the or others have] conducted independent of the litigation," Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311, 1317 (9th Cir. 1995), testimony based on research conducted solely for litigation is admissible as long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152, 119 S.Ct. 1167.
Of primary importance in determining reliability of expert testimony is the methodological soundness of the expert's study. See Liriano v. Hobart Corp., 949 F.Supp. 171, 177 (S.D.N.Y.1996). Each step of the expert's analysis is examined, including "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir., 2002). Ideally, the scientific methodology or technique will have been tested or the findings published and peer reviewed, see Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786, but "[i]t might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." Kumho, 526 U.S. at 151, 119 S.Ct. 1167.
To be considered is whether there is "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions," Nimely, 414 F.3d at 397, and whether the scientific principles and methods have been reliably applied by the expert to the facts of the case. Unfounded extrapolations not supported by, or sufficiently related to, scientific data or expertise should be rejected; opinion that "is connected to existing data only by the ipse dixit of the expert" need not be admitted. General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Expert opinions based on insufficient facts or data, or on unsupported suppositions is not acceptable. See Fed.R.Evid. 702(1). Anecdotal evidence and "generalized assumptions" are inadequate bases for an expert report. United States v. Tin Yat Chin, 371 F.3d 31, 40-41 (2d Cir.2004).
Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony. See, e.g., O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1105-07 (7th Cir.1994); Guidroz-Brault v. Missouri Pacific R.R. Co., 254 F.3d 825, 831 (9th Cir.2001). Sound scientific methodology *285 requires a scholar to make some effort to account for alternative explanations for the effect whose cause is at issue. See, e.g., Kudabeck v. Kroger Co., 338 F.3d 856, 860-61 (8th Cir.2003); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256-57 (11th Cir.2002).
The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility. See Fed.R.Evid. 702 advisory committee note (2000) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."). If two contradictory expert opinions meet the requisite threshold of reliability, it is the function of the factfinder, utilizing the "conventional devices" of "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," to determine which is the more trustworthy and credible. Daubert, 509 U.S. at 596, 113 S.Ct. 2786. It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial.
When considering reliability factors under Rule 702 and Daubert, it is important to recall the Supreme Court's caution that the analytical focus should be on principles and methodology. See Liriano, 949 F.Supp. at 177. Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable. See Daubert, 509 U.S. at 594, 113 S.Ct. 2786.
It is critical that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." Jakobetz, 955 F.2d at 797. Any more rigorous approach would deny the jury's constitutional role.
F. Individual Experts' Reports
1. Challenges to Plaintiffs' Experts
Each of plaintiffs' proposed experts is highly qualified. Each can present testimony that meets requirements for admissibility described in Parts IV.B., C, D, and E, supra.

a) Dr. Carol Levy, M.D.
Dr. Carol Levy is a practicing endocrinologist. Eminent experts on both sides of this litigation acknowledge the difficulty of pinpointing the specific cause of diabetes in any individual. Dr. Levy opines that she can do so. It is defendant's position that Dr. Levy overlooks parts of the medical records as follows:
 For Robert Cusella, contrary to her regular practice, she did not consider any of Mr. Cusella's substantial pre-Zyprexa weight swings and said that such variations might not necessarily be important to her evaluation of his claims.
 For Judith New, she could not say whether plaintiffs pre-Zyprexa history of elevated blood-sugar readings, of which she was unaware, was significant to a diagnosis of diabetes.
 For Monty Souther, she assumed, in the absence of evidence in the medical records, that plaintiff had gained weight while on Zyprexa. Blood glucose readings were all normal while on Zyprexa.
 For Donna Worthington, she did not review medical records that, by her own admission, precluded her conclusion that Zyprexa caused the plaintiffs diabetes.
*286 Def. Mot. to Exclude Testimony of Dr. Carol Levy, 1 (May 29, 2007).
Plaintiffs' [other] experts described at most, an indirect causal chain between Zyprexa and diabetes: Zyprexa may cause weight gain, which may cause insulin resistance, which may cause diabetes.
Id. at 5-6.
While the predicates for Dr. Levy's proposed specific causation testimony may appear to be weak, her distinguished background and clinical experience warrant permitting her to testify. Her credibility will be subject to attack by both cross-examination and the contrary testimony of other experts. The jury may well find it useful on appropriate scientific grounds. Her professional background includes the following: She is presently an assistant Professor of Medicine at Weill Medical College, a consulting physician at Cole-Goldwater Hospital, a Lecturer at Cornell Medical School, an Attending Physician at the Endocrine Clinic, Obstetrics Clinic and Endocrine Consult Service at. New York Presbyterian Hospital, part of the Endocrine Fellowship interviewing/evaluation team and the Internal Medicine Residency interviewing team, and co-director of the Endocrine Fellowship Program at Weill Medical College. Dr. Levy is a member of the American Diabetes Association, the American College of Physicians and the Endocrine Society, and board certified in Internal Medicine, Endocrinology, Diabetes and Metabolism. Dr. Levy has treated patients who have ingested Zyprexa and have diabetes. Report of Dr. Carol Levy, M.D., 1-2 (hereinafter "Levy Report").
This expert's written opinion indicates a thorough understanding of diabetes. Id. passim. She also has read widely in relevant fields. Id., Index to Zyprexa Literature (attached to Levy Report). Her opinion will be admitted.

b) Dr. Stefan P. Kruszewski, M.D.
Lilly moves to exclude the opinions offered by plaintiffs' proposed expert witness Stefan P. Kruszewski, M.D. on the ground that they are factually flawed and include matters on which he is not qualified to testify. Dr. Kruszewski's testimony is inadmissible, according to Lilly, for the following reasons:
 Dr. Kruszewski's opinions concerning the supposed flaws of clinical research that supported Zyprexa are factually incorrect, speculative, and not relevant. His contentions have been dispelled by the FDA's own analysis of the data he cites.
 Dr. Kruszewski is not qualified to offer his opinion disputing the increased risk of diabetes associated with serious mental illness, a link addressed in literature published over decades.
Def. Mot. to Exclude Testimony of Stefan Kruszewski, 1-2 (May 29, 2007).
Dr. Kruszewski is offered to, testify to two main opinions:
 The clinical research that has supported Zyprexa's pre-approval and post-approval status is tainted because the data from clinical trials that supported Zyprexa included the work of scientific researchers who have been sanctioned and/or indicted for research misconduct unrelated to Zyprexa.
 The extensive medical literature over the past several decades which had discussed an increased risk for diabetes among those with serious mental illness has little scientific basis to support it.
Dr. Kruszewski will not be permitted to testify to the fact that some Zyprexa studies included work of researchers sanctioned or indicted. This information is likely to inflame the jury and is not useful *287 since those studies, if offered, will probably be discounted by opposing experts who will testify. He can testify on all other aspects of his report.
This distinguished expert's analysis of the relevant literature may be useful to the jury. Dr. Kruszewski's experience provides an adequate basis for his opinion and proposed testimony. His curriculum vitae includes the following: He has 28 years of clinical practice (including internship and residency) in which he treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom he prescribed numerous drugs for psychiatric and neuropsychiatric indications. He witnessed the side effects of drugs that predispose an individual to neuropsychiatric complications. During this time and with this population, he monitored the effects of various antipsychotics, including Zyprexa.
Dr. Kruszewski has expertise in psychopharmacology, including education in medical school, internship, residency, postgraduate work and continuous reading and updating through Continuing Medical Education (CME) work. He has been an educator regarding basic and applied psychiatric and neuropsychiatric psychopharmacology, including metabolic dysfunction, at several institutions, including Harvard Medical School (1974-77), (specifically, the epidemiology of obesity), UMDNJ-Rutgers Medical School/Robert Wood Johnson for several years as a member of their residency program and faculty (1980-83) and University of Pittsburgh School of Medicine, Western Psychiatric Institute and Clinic (1988-1991), Allegheny General Hospital and related Medical Schools, (1991-92), University of North Texas Medical School (1992-93) and, as a member of the Clinical Faculty of Penn State College of Medicine-Hershey Medical School (1999-2004). As part of those academic teaching appointments, he lectured on epidemiology, psychiatry, neuropsychiatry and related-fields, including factors that affect and illness of individuals and populations to identify risk factors for disease and to determine optimal treatment approaches to clinical practice. His work has been published as solo and primary author in peer-reviewed journals, including the BMJ (previously titled, British Medical Journal), American Journal of Psychiatry, Neurology, Journal of the American Medical Association, the New England Journal of Medicine, Annals of Clinical Psychiatry, Journal of Clinical Psychiatry (as of Spring 2007) and others. Those publications have covered a wide spectrum of issues pertaining to drugs (including antipsychotics), side-effects, conflicts of interest and the validity and consistency of research.
This expert is on the Board or Directors of the Alliance for Human Research Protection. In that capacity, he reviews and analyzes information from national and international peer-reviewed and edited sources related to clinical research on issues pertaining to drugs and device side-effects. That work includes his ongoing study of effects and side-effects of anticonvulsants, antidepressants, antipsychotics, stimulants, sedatives, drugs of abuse and mood-stabilizing drugs. In 2001-2003, he provided psychiatric expertise regarding behavioral access to care for a white paper designed for the NCQA (National Committee on Quality Assurance, Washington D.C.) and to be used a guide for nationwide behavioral health programs. He participated in the design and implementation of drug trials, including Zyprexa. He performed extensive research of peer- and non-peer-reviewed scientific literature, including an in-progress review of Zyprexa New Drug Application (NDA) documents concerning the mechanism of action, efficacy and safety features of olanzapine. Report *288 of Stefan Kruszewski, M.D., 1-4 (March 21, 2007).

c) Dr. Arvin P. Shroff, Ph.D.
Plaintiffs' FDA regulatory expert Arvin P. Shroff, Ph.D. proposes to testify that Lilly (1) failed to provide sufficient safety information to the FDA, including information required by its post-marketing adverse event reporting obligations; (2) failed to make appropriate and timely labeling changes; (3) delayed communicating the September 2003 labeling change; and (4) failed to warn physicians and patients about weight gain, hyperglycemia, and diabetes.
In addition, Dr. Shroff proposes to offer general opinions to the effect that the FDA's review of prescription medications is limited by the information provided by the sponsor; that the performance goals of the Prescription Drug User Free Act limit the FDA's review of prescription drugs; that the FDA lacks the authority to dictate product labeling; and that Lilly had an obligation to distribute medical literature to physicians.
Lilly points out that although he purports to be an FDA regulatory expert, Dr. Shroff has only two years of experience in product labeling, gained more than thirty years ago. Lilly asserts that this proposed expert has neither looked at any key data nor conducted any independent analysis of the issues on which he testifies. For example, Lilly claims:
 Dr. Shroff has not looked at any data related to Lilly's interactions with the FDA. He acknowledges that he has no evidence that Lilly failed to communicate the adverse events of Zyprexa to the FDA or in any other way failed to fulfill its post-marketing safety reporting responsibilities under the FDCA.
 Instead of performing his own analysis of the facts of this litigation, Dr. Shroff relied on facts reported in two articles about Lilly that he read in the New York Times.
 Dr. Shroff reviewed only the warnings section of one Zyprexa label, from a copy of the Physician's Desk Reference he had at home. Apart from this one label, he has not reviewed any of the Zyprexa labeling as it has evolved over the time Zyprexa has been on the market. Dr. Shroff does not know when Lilly first included information about weight gain, hyperglycemia, or diabetes in the Zyprexa labeling.
 Dr. Shroff has not determined when Lilly knew or should have known that there reasonable evidence of an association between Zyprexa and weight gain, hyperglycemia, or diabetes that would have necessitated adding a warning to the Zyprexa labeling.
 Dr. Shroff prepared his report in less than three days, largely copying it from reports he has submitted in litigation involving other pharmaceuticals.
Def. Mot. to Exclude Testimony of Arvin Shroff, 1-2 (May 29, 2007).
Dr. Shroff has a good general knowledge of how the FDA operates. He can testify as to this. He may not testify as to the specifics of how Zyprexa regulatory issues were processed by the FDA; he has no specific knowledge of this matter.
As to general knowledge, Dr. Shroff's background qualifies him to be helpful to the jury. It includes the following: He is the President of Arvin Shroff Associates, LLC, a consulting film specializing in FDA regulatory, enforcement and compliance issues including submissions of various types of applications and documents to FDA. The firm provides advice to pharmaceutical manufacturers, biotechnology companies, medical device firms, biological industry, *289 and food firms (including dietary supplement companies). He spent 26 years with the Food and Drug Administration (FDA) employed in various capacities before retirement on June 30, 2000 as the Deputy Director of the Office of Enforcement.
He began his career with the FDA in 1974 at the Center for Drug Evaluation and Research ("CDER") in the Office of New Drug Evaluation as a Review Chemist. His main responsibilities included reviewing Investigational New Drug Applications (INDs), New Drug Applications (DMFs), as well as supplements and amendments associated with these applications. He also reviewed Abbreviated New Drug Applications (ANDA) and Abbreviated Antibiotic Drug Applications (AADAs) on occasion. During his tenure in this position, he reviewed and evaluated numerous different types of drug products. He was a member of many FDA technical committees the prepared guidance documents for the regulated industry in various drug-related subject areas such as Stability, Packaging, Chemistry and Manufacturing Controls. He was also an FDA liaison with the United States Pharmacopoeia, a scientific standard-setting organization, recognized in the Food, Drug and Cosmetic Act (Act).
In 1976, he was promoted to Chief, Product Surveillance Branch, Division of Drug product Quality, Office of Compliance, CDER, with primary responsibilities to help determine the quality of imported and domestic drugs distributed in the United States. In 1981, he was promoted to Director, Division of Field Science, Office of Regulatory Affairs ("ORA"). In that role, he directed and managed the scientific efforts and methods development research for ORA laboratories (there were 19 laboratories and 7 Research Centers in ORA at that time) for all program areas (food, drugs, devices, biologics and veterinary medicine). In 1985, he became the Deputy Director, Office of Regional Operations, ORA. He supervised and coordinated FDA's regulatory activities, such as inspections, imports, surveillance and emergency operations, as well as recall activities dealing with district and regional offices. These activities involved all FDA program areas, including drugs and biologics. In 1992, he became Deputy Director, Office of Enforcement, ORA. In that role he evaluated and coordinated proposed legal actions to ascertain compliance with regulatory policy and enforcement objectives, including GMP issues, recalls and other enforcement and compliance issues. The recall unit was transferred from Office of Regional Operations to the Office of Enforcement, where he oversaw hundreds of recalls each year in all program areas.
Prior to working at the FDA, this expert was employed as a Group Leader and Senior Research Chemist at Ortho Pharmaceutical Corporation, a Johnson & Johnson subsidiary, where he was involved in both synthetic organic chemistry and analytical chemistry. He received his Ph.D. in Pharmaceutical Chemistry from the School of Pharmacy, University of Maryland in 1962. Report of Alvin Shroff, Ph.D., 1-3 (March 25, 2007). He has authored a considerable number of publications on FDA practice. Id. at appendix III.

2. Challenges to Defendant's Expert Dr. Robert R. Henry, M.D.

Plaintiffs challenge the report and proposed testimony of Dr. Robert R. Henry on the grounds that:
 A significant number of important mechanistic and non-mechanistic studies were not reviewed or considered by Dr. Henry in formulating his opinion.
 Dr. Henry criticizes existing mechanistic studies but does not cite to any *290 studies to show divergence in the scientific community.
 Dr. Henry's opinion does not conform with the "consensus" opinion of his peers.
 Dr. Henry's clamp study revealed an increase of weight gain as well as insulin change accompanied with Zyprexa use, suggesting a strong link between Zyprexa and diabetes.
Pl. Mot. to Exclude Testimony of Dr. Robert R. Henry (May 29, 2007).
None of these objections warrant Daubert exclusion, particularly in view of the expert's distinguished career which fully qualifies him to give his proposed opinions that available scientific data do not establish a causal relationship between Zyprexa and type 2 diabetes. The opinion may be helpful to the jury.
His background includes the following: He holds an M.D. from the University of Manitoba Medical School, and is board certified by the American Boards of Internal Medicine and Endocrinology and Metabolism. Currently he is employed as Professor of Medicine at the University of California, San Diego, and Chief of the Section of Endocrinology, Metabolism and Diabetes and the Special Diagnostic and Treatment Unit at the Veterans Administration Medical Center, San Diego. The Special Diagnostic and Treatment Unit functions primarily as a clinical center of research in diabetes and obesity. He is also Director of the Center for Metabolic Research, which administers all aspects of the clinical research conducted at the Special Diagnostic and Treatment Unit. At the University of California, San Diego, he regularly teach courses in endocrinology and diabetes, and he supervises the education and clinical training of medical students, residents and fellows in the treatment of diabetes and other endocrinologic and metabolic disorders. In his clinical practice at the VA Medical Center, San Diego, he treats patients with metabolic disorders. About 80% of his patients have diabetes. They include people who have serious mental disorders, including patients with schizophrenia and bipolar disorders, who are being treated with atypical antipsychotics.
This expert's research focuses on abnormalities of glucose and fat metabolism in patients with obesity, as well as those with type 1 and type 2 diabetes and those who are prediabetic. A focus of his research involves studies directed at understanding the interaction between obesity and type 2 diabetes. He regularly designs, conducts, and evaluates mechanistic studies of glucose and fat metabolism, including vivo studies such as glucose clamp technique and in vitro studies of human fat and muscle tissues. This research includes studies directed at elucidating the mechanisms by which atypical antipsychotics, including Zyprexa, may influence glucose and fat metabolism. He has also been an investigator in a number of national diabetes-related research studies, including the Diabetes Prevention Program and the VA Co-Operative Studies Program diabetes trial of glycemic control and complications in diabetes mellitus type 2. His activities include service to the American Diabetes Association. In the past five years, he served on the ADA's Board of Directors, Research Policy Committee (chair), and National Legal Advocacy Subcommittee, and also served as a Meeting Abstract Reviewer for the ADA National Meeting. He is a reviewer of manuscripts for many of the leading endocrinology and medical journals and of grant applications submitted to many organizations, including the ADA, the Veterans Administration, and the National Institute of Health. Report of Robert R. Henry, 1-2 (May 9, 2007).
*291 V. Conclusion
In view of the extensive briefing, oral submissions, and clarity of the law and facts, no further argument is required.
A. Robert Cusella
Summary judgment against Robert Cusella is granted with costs and disbursements. Either party may submit a judgment.
B. Judith New
Summary judgment against Judith New is denied.
C. Monty Souther
Summary judgment against Monty Souther is denied.
D. Donna Worthington
Summary judgment against Donna Worthington is denied.
SO ORDERED.